# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.

JUAN ALMANZAR, and
JOCELYN EVANS on behalf
of themselves and all others
similarly situated,

    Plaintiffs,

                 **CLASS ACTION**
v.                   **JURY DEMAND**

SELECT PORTFOLIO SERVICING, INC.,
CREDIT SUISSE (USA), INC.,
ASSURANT, INC.,
STANDARD GUARANTY
INSURANCE COMPANY, and
AMERICAN SECURITY INSURANCE COMPANY,

    Defendants.

_____/

## CLASS ACTION COMPLAINT

Plaintiffs JUAN ALMANZAR and JOCELYN EVANS file this class action complaint on behalf of themselves and all others similarly situated against SELECT PORTFOLIO SERVICING, INC. ("SPS"), CREDIT SUISSE (USA), INC., ("CREDIT SUISSE" and together with SPS, the "SPS Defendants") ASSURANT, INC. ("Assurant"), STANDARD GUARANTY INSURANCE COMPANY ("Standard Guaranty" or "SGIC"), and AMERICAN SECURITY INSURANCE COMPANY ("American Security" or "ASIC," together with Assurant and SGIC, the "Assurant Defendants").

## INTRODUCTION

### The Force-Placed Insurance Industry

1.  Lenders and servicers force place insurance when a borrower fails to obtain or

maintain proper hazard, flood, or wind insurance coverage on property that secures a loan. Under the typical mortgage agreement, if the insurance policy lapses or provides insufficient coverage, the lender has the right to "force place" a new policy on the property and then charge the premiums to the borrower.

2.     However, mortgage lenders and servicers, like the SPS Defendants here, have set up questionable and often illegal practices related to force-placed insurance.  The lenders and servicers have entered into exclusive and collusive relationships with certain force-placed insurance providers, here Assurant and its affiliates SGIC and ASIC, that result in exceptional profits to both the lenders and the force-placed insurers

3.     The arrangements comprise an extremely lucrative profit-making scheme that reaps hundreds of millions of dollars annually for its participants. There are just two insurance companies that control nearly the entire market for forced-placed policies in the country— Assurant and QBE.  Assurant works through its subsidiaries, including American Security and Standard Guaranty. These companies and their affiliates enter into exclusive relationships with the major mortgage lenders and servicers to provide the policies.  To maintain their exclusive relationships with these lenders, the insurers pay them unearned "kickbacks," in the form of direct payments (sometimes disguised as "expense reimbursements") or in the form of a percentage of the force-placed policy premiums – ultimately charged to the borrower, offer them subsidized or discounted administrative services, and enter into lucrative captive reinsurance deals with them.

4.     The money to finance the force-placed insurance schemes comes from unsuspecting borrowers who are charged inflated amounts for the force-placed insurance premiums by lenders or servicers – SPS here.  In many instances, borrowers are required to pay

355285                                          2

for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper fees.

5. The Defendants' force-placed insurance scheme takes advantage of the broad discretion afforded the lenders and/or servicers in standard form mortgage agreements. The agreements typically require the borrower to carry hazard insurance sufficient to cover the lender's interest in the property against fire and other perils. If a homeowner's "voluntary" policy lapses, the mortgage agreement allows the lender to "force place" a new policy on the property at the borrower's expense.

6. Although force-placed insurance is designed to protect the lender's interest in the property that secures the loan and thus should not exceed that interest, lenders often purchase coverage from their exclusive insurers in excess of that required to cover their own risk. And, as a matter of practice, the major lenders and servicers collude with the two major force-placed insurers to manipulate the force-placed insurance market, which leads to artificially inflated premiums that are charged to consumers, resulting in premiums up to ***ten times*** greater than those available to the consumer in the open market. Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

7. At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[1]

---

[1] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012. The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

**LPI Premiums Have Quadrupled Since 2004**

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|-------------------------------------|-----------------------------------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                    13                    August 9, 2012

8.    Assurant, a named defendant here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks disguised as commissions or reimbursements, and other benefits.

**Assurant and QBE Are the Market for LPI:**
**Countrywide Market Share**

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|------------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                                    August 9, 2012

9.      It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and regulators.  For example:[2]

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[3]  Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

---

[2] The Defendants' practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

[3] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at*, http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

355285                                          5

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers. He went on to state:

  > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and stated that stricter regulations may be needed.[4]

- On October 17, 2013, The Florida Office of Insurance Regulation and ASIC entered into a Consent Order that prohibits ASIC from, among other things, paying a commission to a servicer or lender, using an affiliate of a lender to reinsure the FPI policies, or providing free or below-cost outsourced services to mortgage servicers or their lenders.

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[5]

10.     Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

---

[4] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*, http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

[5] *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

**LPI Premium by State:  Florida Has Become Ground Zero**

|     | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|-----|-------|-------|-------|-------|-------|-------|-------|-------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY  | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL  | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ  | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI  | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH  | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA  | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA  | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                    15                              August 9, 2012

11.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by SPS, Credit Suisse, Assurant, SGIC, and ASIC.

## PARTIES

**Plaintiffs**

12.     Plaintiff JUAN ALMANZAR is a citizen of the State of New Jersey.  He is a natural person over the age of 21 and otherwise *sui juris*.

13.     Plaintiff JOCELYN EVANS is a citizen of the State of Texas.  She is a natural person over the age of 21 and otherwise *sui juris*.

**Defendants**

14.     Defendant ASSURANT, INC. is a Delaware corporation with its principal office in New York, New York.  Assurant participates in the force-placed insurance market through its

355285                                          7

trade name, Assurant Specialty Property, and its business strategy "is to pursue long term growth in lender placed homeowner's insurance . . . . The largest product line within Assurant Specialty Property is homeowners insurance consisting principally of fire and dwelling hazard insurance offered through [Assurant's] lender placed program." [6]

15.    Upon information and belief, Assurant owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including SGIC and ASIC) to operate their force-placed insurance business under that name.

16.    Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  American Security often operates under the trade name "Assurant Specialty Property."  American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

17.    Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Georgia.  Standard Guaranty also often operates under the trade name "Assurant Specialty Property."  Standard Guaranty along with American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed

---

[6] *See* Assurant Form 10-K for the fiscal year ending December 31, 2011, at 5, *available at* http://www.sec.gov/Archives/edgar/data/1267238/000119312512075371/d257568d10k.htm.

insurance policies on properties when a borrower's insurance has lapsed

18.    Upon information and belief, American Security and Standard Guaranty pass much of their profits from force-placed insurance to their corporate parent, Assurant.

19.    Defendant SELECT PORTFOLIO SERVICING, INC., is a Utah corporation and a residential loan servicing company with office operations in Jacksonville, Florida and Salt Lake City, Utah.  Upon information and belief, SELECT PORTFOLIO SERVICING, INC. is the former Fairbanks Capital Corporation, which changed its name to Select Portfolio Servicing, Inc., in June 2004.  Select Portfolio Servicing regularly conducts business in the State of Florida and throughout the United States.

20. Defendant CREDIT SUISSE (USA), INC., is a wholly owned subsidiary of CREDIT SUISSE GROUP AG, a global financial services provider headquartered in Zurich, Switzerland. CREDIT SUISSE GROUP AG operates internationally and in the United States through its subsidiaries.  CREDIT SUISSE (USA), INC operates throughout the United States, including from offices in Miami, Florida.  Upon information and belief, CREDIT SUISSE (USA), INC., purchased SELECT PORTFOLIO SERVICING, INC. in 2005 and operates it as a wholly owned subsidiary.

## JURISDICTION AND VENUE

21.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

22.    Plaintiffs are citizens of the States of New Jersey and Texas.  Defendants are citizens of Delaware, Utah, and various other states but are registered to do business in the aforementioned states and Florida.  The amount in controversy exceeds $5,000,000 and there are

at least one hundred members of the putative class.

23.     This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

24.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

25.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

26.     All conditions precedent to this action have occurred, been performed, or have been waived.

## **FACTUAL ALLEGATIONS**

27.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the full cost of the premium is neither a new concept nor a term undisclosed

355285                                          10

to borrowers in mortgage agreements.  The standard form mortgage agreements used by SPS include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the premiums to the borrower rather than declare the borrow in default.

28.     What is unknown to borrowers and not disclosed in the mortgage agreements is that the SPS Defendants have exclusive arrangements with Assurant and its affiliates, including ASIC and SGIC, to manipulate the force-placed insurance market and artificially inflate the amounts they charge to borrowers for force-placed insurance "premiums."  The charges are inflated to provide the SPS Defendants and their affiliates with kickbacks often disguised as "commissions" or "expense reimbursements," or to cover the cost of discounted services, or to provide the lender or servicer with lucrative reinsurance arrangements as well as to include unmerited charges.  The borrower is then forced to pay the inflated charges.

### The Force-Placed Insurance Scheme

29.     The Assurant Defendants have exclusive arrangements with the SPS Defendants to monitor their mortgage portfolios and provide force-placed insurance.  In addition to subsidized mortgage services received from the Assurant Defendants, a percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to the SPS Defendants or their affiliates – which in turn compensate the SPS Defendants in the form of "soft-dollar" credits, direct payments, or "expense reimbursements."  Upon information and belief, the SPS Defendants receive additional compensation from the Assurant Defendants through captive reinsurance arrangements, direct payments, or expense reimbursements.

30.     The scheme works as follows. The SPS Defendants purchase master insurance policies that cover the entire portfolio of mortgage loans.  In exchange, the Assurant Defendants are given the exclusive right to force their own insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.  Assurant and its affiliates monitor the SPS Defendant's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, an Assurant affiliate, (in Plaintiffs' case, ASIC and SGIC), send notices to the borrower, on letterhead purporting to come from the lender or servicer, that insurance will be "obtained" and force-placed.  If a lapse continues, the insurer notifies the borrower that insurance is being force-placed at his or her expense.

31.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and the premium charged to the borrower.  In many instances, the insurance lapse is not discovered for months or even years after the fact. Despite the absence of any claim or damage to the property during the period of lapse, retroactive coverage is placed on the property and the borrower is charged for the "cost" of the past premiums.

32.     Once coverage is forced on the property, the SPS Defendants pay the insurer and charge the borrower for the payment, which is either deducted from the borrower's mortgage escrow account or added to the balance of the borrower's loan.[7]  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.

33.     The SPS Defendants pay the premiums to the insurers who then kick back a set

---

[7] On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

percentage to the SPS Defendants or their affiliates as a "commission."  Upon information and belief, a percentage of the payment made to the SPS Defendants are then shared with the lender or servicer, sometimes in the form of "soft dollar" credits, "expense reimbursements," or in some other form.

34.     Upon information and belief, the SPS Defendants also enter into an arrangement with the Assurant Defendants that provide the SPS Defendants or their affiliates with "qualified expense reimbursement" payments.  These "expense reimbursements" were not legitimate reimbursements for actual costs and were simply another form of a kickback to the SPS Defendants for the exclusive arrangement to force-place insurance.  The SPS Defendants did not perform any bona fide services nor incur any costs for the payments that they received.

35.     The money paid back to the SPS Defendants and their affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to mask the kickbacks as legitimate, Assurant, ASIC, or SGIC will often disclose to the borrower that affiliates of SPS may earn "commissions" as a result of the forced placement of new coverage or that the SPS Defendants incurred "costs" as a result of the force-placement of insurance.  In reality, however, no work is ever done by the SPS Defendants or their affiliates to procure insurance for that particular borrower because the coverage comes through the master or umbrella policy already in place.  As a result, no commission or compensation is "earned" and the SPS Defendants do not incur any costs in relation to the force-placement of insurance for any particular borrower.

36.     Under this highly profitable force-placed insurance scheme, the SPS Defendants are incentivized to purchase and force place insurance policies with artificially inflated premiums on borrowers' properties because the higher the cost of the insurance policy, the higher the

kickback.  And, as a result of the kickbacks, the SPS Defendants effectively pay a reduced amount for the force-placed insurance policy but choose not to pass these savings on to the borrowers.

37.     The Assurant Defendants and the SPS Defendants also enter into agreements for ASIC or SGIC to provide servicing activities on their entire loan portfolio at below cost.  The servicing costs are added into the force-placed premiums which are then passed on to the borrower.  The insurers are able to provide these services at below cost because of the enormous profits they make from the hyper-inflated premiums charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay the charges from the lenders unfairly bear the entire cost to service the entire loan portfolio. These charges, passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities.

38.     Thus, the small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring the SPS Defendants entire loan portfolio, effectively resulting in an additional kickback.

39.     In addition, upon information and belief, the Assurant Defendants will enter into essentially riskless "captive reinsurance arrangements" with the SPS Defendants or their affiliates to "reinsure" the property insurance force-placed on borrowers.  A recent *American Banker* article illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance they buy on behalf of mortgage borrowers who have stopped paying for their own coverage. In JPMorgan's case, 75% of the total force-placed premiums cycle back to the bank through a reinsurance affiliate. This has raised further questions about the force-placed market's arrangements. . . .

Over the last five years, Chase has received $660 million in reinsurance payments and commissions on force-placed policies, according to New York's DFS. . . .

Of every hundred dollars in premiums that JPMorgan Chase borrowers pay to Assurant, the bank ends up keeping $58 in profit, DFS staff asserted. The agency suggested the bank's stake in force-placed insurance may encourage it to accept unjustifiably high prices by Assurant and to avoid filing claims on behalf of borrowers, since that would lower its reinsurer's returns.

The DFS staff also questioned the lack of competition in the industry, noting that Assurant and QBE have undertaken acquisitions that give them long-term control of 90% of the market.  Further limiting competition are the companies' tendency to file identical rates in many states, Lawsky and his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May 18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-regulator-attack-1049460-1.html.

40.     The SPS Defendants' reinsurance program, like those of other lenders, is simply a way to funnel profits, in the form of ceded premiums, to the SPS Defendants at borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it does not.  On information and belief, the SPS Defendants and their affiliates enter into reinsurance agreements with the Assurant Defendants that provide that the insurer will return to the SPS Defendants significant percentages of the premiums charged borrowers by way of ceded reinsurance premiums to their affiliates or subsidiaries.  The ceded premiums are nothing more than a kickback to the SPS Defendants and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while the SPS Defendants or their affiliates purportedly provided reinsurance, they did not assume any real risk.

41.     The SPS Defendants also overcharge borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in the standard form

mortgage agreement.  Either of these clauses typically protects the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

42.     The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when the SPS Defendants add the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender.

43.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated and illegitimate noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to the Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of captive reinsurance arrangements and administrative services.

44.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies.  Force-placed policies are commercial insurance policies intended to be sold to lenders or servicers and their terms are determined by the lender or servicer – SPS, and the insurer - the Assurant Defendants

45.     Plaintiffs here do not challenge SPS's right to force place insurance in the first instance.  They challenge Defendants' manipulation of the force-placed insurance market with an eye toward artificially inflating amounts charged for the force-placed premiums and placing

unnecessary coverage, which the SPS Defendants purchase from the Assurant Defendants and then choose to pass on to the borrower. Servicers, like SPS, are financially motivated to utilize the insurer, like the Assurant Defendants, that offers it the best financial benefit in the terms of "commissions," direct payments, "expense reimbursements," discounted tracking services, or ceded reinsurance premiums This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them and the other members of the Class beyond the true cost of insurance coverage.

### Plaintiff Juan Almanzar

46.     Plaintiff Juan Almanzar took a mortgage loan from Accredited Home Lenders, Inc. in October 2006 secured by a mortgage on real property in North Bergen, New Jersey.    At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned or serviced by SPS.

47.     Mr. Almanzar's mortgage agreement is attached as **Exhibit A**.

48.     Mr. Almanzar had voluntary hazard insurance coverage with The Philadelphia Contributorship Insurance Company.  Mr. Almanzar's annual premium for his voluntary hazard insurance was $2,063 in 2006.

49.     The Defendants sent Mr. Almanzar a Notice of Intent to Place Insurance by letter dated August 30, 2012.  They notified him that because they had not received proof of Mr. Almanzar's homeowner's insurance coverage, they were purchasing insurance for his property. The letter included a temporary 56 day insurance binder from ASIC for retroactive coverage that commenced July 16, 2012.  The annual premium for the force-placed policy was $5,133.79.

50.     The Defendants sent Mr. Almanzar a letter dated June 6, 2013, in which they notified him that the insurance they purchased for him in 2012 was due for renewal on July 16,

2013.  They further stated that if the force-placed policy renewed, the premium would be paid from his escrow account.

51.    The Defendants sent Mr. Almanzar a Notice of Placement of Insurance dated October 3, 2012.  The Notice of Placement included a force placed insurance policy from ASIC.  The premium for the policy was $5,133.79.

52.    The Defendants sent Mr. Almanzar a letter dated May 26, 2014, in which it notified Mr. Almanzar that it was renewing the lender placed policy already in effect.  The premium for the new policy was expected to be $4, 210.

53.    The Defendants never disclosed to Mr. Almanzar that the "premium" that they were charging him included unearned kickbacks (in various forms) to the SPS Defendants as well as the cost of servicing the SPS Defendants mortgage portfolio.  The amounts kicked back to the SPS Defendants were not reduced from the amount charged to Plaintiff Almanzar.

54.    There are no material differences between these Defendants' actions and practices directed to Mr. Almanzar and their actions and practices directed to the Class

**Plaintiff Jocelyn Evans**

55.    Plaintiff Jocelyn Evans took a mortgage loan from Fremont Investment & Loan in June 2006 secured by a mortgage on real property in Lucas, Texas.    At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned or serviced by SPS.

56.    Ms. Evans' mortgage is attached as **Exhibit B**.

57.    The voluntary insurance on Plaintiff Evans' home eventually lapsed.

58.    At some point after SPS took over Ms. Evans' loan, it began force-placing insurance on Ms. Evan's home through SGIC.

59.    For example, SPS, force-placed a hazard insurance policy through SGIC on Ms.

18

Evans' home for the annual period of June 2013 to June 2014 and charged her the amount of $6,028.88 for the force-placed policy.

60.     In an August 19, 2013 letter to Ms. Evans, purportedly coming from SPS, it informed her that the "premium" of the force-placed policy would be charged to her escrow account.

61.     The Defendants never disclosed to Ms. Evans that the "premium" that they were charging her included unearned kickbacks (in various forms) to the SPS Defendants as well as the cost of servicing the SPS Defendants mortgage portfolio.  The amounts kicked back to the SPS Defendants were not reduced from the amount charged to Plaintiff Evans.

62.     Upon information and belief, SPS continues to charge Ms. Evans for these force-placed policies

63.     There are no material differences between these Defendants' actions and practices directed to Ms. Evans and their actions and practices directed to the Class.

## CLASS ALLEGATIONS

### A.     Class Definitions

64.     Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all other persons similarly situated. Plaintiffs seek to represent the following classes:

Nationwide class:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property through SPS or these companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

New Jersey Subclass as to Counts V and VI – New Jersey Consumer Fraud Act:

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State of New Jersey, through the SPS Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

65.    Plaintiffs reserve the right to modify or amend the definitions of the proposed classes before the Court determines whether certification is appropriate.

66.    Defendants subjected Plaintiffs and the respective Class members to the same unfair, unlawful, and deceptive practices and harmed them in the same manner.

**B.    Numerosity**

67.    The proposed classes are so numerous that joinder of all members would be impracticable. Defendants sell and service millions of mortgage loans and insurance policies in the states of Florida, Texas, and New Jersey, as well as nationwide. The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants. The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually. Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

**C.    Commonality**

68.    There are questions of law and fact that are common to Plaintiffs' and Class members' claims. These common questions predominate over any questions that go particularly to any individual member of the Class. Among such common questions of law and fact are the

355285

20

following:

    a.   Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages;

    b.   Whether the SPS Defendants breached their mortgage contracts with Plaintiffs and the Class by charging them amounts for force-placed insurance that included illegal kickbacks (including unwarranted commissions, "expense reimbursements," and reinsurance payments) and by charging Plaintiffs and the Class for servicing their loans;

    c.   Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

    d.   Whether the SPS Defendants breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with selected insurers and/or their affiliates, which resulted in inflated amounts for insurance premiums being charged to Plaintiffs and the Class;

    e.   Whether Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

    f.   Whether the SPS Defendants or their affiliates perform any work or services in exchange for the "commissions" or other "compensation" they collect;

    g.   Whether the charges to Plaintiffs and the Class are inflated to include kickbacks and unwarranted "commissions" or "expense reimbursements;"

    h.   Whether the charges to Plaintiffs and the Class are inflated to include amounts for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

    i.   Whether the charges are inflated to include the cost of a captive reinsurance arrangement;

    j.   Whether the SPS Defendants violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

    k.   Whether the SPS Defendants violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

    l.   Whether Defendants actions and failure to disclose the real reasons for the

high priced force placed policy premiums were likely to deceive the consuming public in violation of the NJCFA;

m. Whether the Assurant Defendants intentionally and unjustifiably interfered with the Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio;

n. Whether Defendants were associated with the enterprise and agreed and conspired to violate the Federal RICO statutes; and

o. Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

### D.    **Typicality**

69.    Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

### E.    **Adequacy of Representation**

70.    Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

71.    To prosecute this case, Plaintiffs have  chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

**F.      Requirements of Fed. R. Civ. P. 23(b)(3)**

72.     The questions of law or fact common to the Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

73.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

74.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.      Superiority**

75.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

(a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

(b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

(c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

(d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

(e) Individual suits would not be cost effective or economically maintainable as individual actions; and

(f) The action is manageable as a class action.

**H.      Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

76.      Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

77.      Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

### BREACH OF CONTRACT
### (against the SPS Defendants)

78.      Plaintiffs re-allege and incorporate paragraphs 1-77, above as if fully set forth herein and further allege as follows.

79.      Plaintiffs and all similarly situated class members have mortgages that are owned or serviced by SPS.

80.      Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance requirements and its placement by SPS.

81.      Plaintiffs' mortgages require that they maintain insurance on their property and provide that if they fail to do so, then the lender may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower the cost.

82.      The SPS Defendants charge borrowers premiums that include unearned kickbacks, reinsurance premiums, "expense reimbursements," as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to

355285

protecting the SPS Defendants' rights or risk in the collateral for borrowers' mortgage loans. The SPS Defendants breached the mortgage agreements by, among other things, charging Plaintiffs and class members the amounts beyond the actual cost of coverage.

83.     The SPS Defendants also breached Plaintiffs' and the Class members' mortgage agreements by charging Plaintiffs and the Class for excess and unnecessary force-placed insurance coverage as such coverage does not protect SPS's rights in their collateral or cover their risk.

84.     Plaintiffs and the Class members have suffered damages as a result of the SPS Defendants' breaches of contract.

**WHEREFORE**, Plaintiffs on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from the SPS defendants ' breach of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (against the SPS Defendants)

85.     Plaintiffs re-allege and incorporate paragraphs 1-77, above as if fully set forth herein and further allege as follows.

86.     A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

87.     Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act

capriciously to contravene the reasonable contractual expectations of the other party.

88.     Plaintiffs' and the Class Members' mortgage contracts allow the SPS Defendants to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

89.     The SPS Defendants are afforded substantial discretion in force-placing insurance coverage.  They are permitted to unilaterally choose the company from which they purchase force-placed insurance and negotiate any price for the coverage they procure.  The servicers have an obligation to exercise the discretion afforded them in good faith, and not capriciously or in bad faith.  Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

90.     The SPS Defendants breached the implied covenant of good faith and fair dealing by, among other things:

> (a)   Manipulating the force-placed insurance market by selecting insurers (here, Assurant and its affiliates) that will artificially inflate premiums to include kickbacks to SPS and issue excess insurance coverage not necessary to cover SPS's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from Assurant and its affiliates without seeking a competitive price;

> (b)  Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

> (c)   Assessing inflated and unnecessary amounts for insurance policy premiums against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

> (d)  Allowing the SPS Defendants or their affiliates to collect a percentage of the premiums charged to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced premiums possible;

(e)  Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(f)  Charging Plaintiffs and the Class for "expense reimbursements" when no expenses are incurred by the SPS Defendants in the force-placement of a borrower's insurance;

(g)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class;

(h)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(i)  Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan; and

(j)  Charging Plaintiffs and the Class an inflated amount for the force-placed insurance premium due to the captive reinsurance arrangement.

91.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the premiums charged and the terms of the force-placed insurance policies violate the duties of good faith and fair dealing.   Plaintiffs also seek compensatory damages resulting from the SPS Defendants breaches of the implied covenant. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT III

### UNJUST ENRICHMENT
### (against the SPS Defendants)[8]

92.    Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

---

[8] Plaintiffs plead their unjust enrichment claim against SPS in the alternative to their contractual claims against them.

93.     The SPS Defendants and their affiliates received from Plaintiffs and Class members, benefits in the form of inflated amounts for insurance premiums related to force-placed insurance policies, unwarranted kickbacks, reimbursements, captive reinsurance arrangements, and subsidized loan servicing costs.

94.     These Defendants entered into an agreement whereby the insurance vendor, here, Assurant's subsidiaries, including, American Security and Standard Guaranty, would provide force-placed insurance policies to the SPS Defendants for the portfolio of loans monitored on behalf of the SPS Defendants.  The SPS Defendants would then charge Plaintiffs and the Class amounts that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed policies imposed on borrowers were therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

95.     These Defendants also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

96.     The Assurant Defendants paid and collected significant monies in premiums, kickbacks, "expense reimbursements," and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage).  Unearned commissions or kickbacks were paid directly to the SPS Defendants or their affiliates in order to be able to exclusively provide force-placed insurance policies.  The Assurant Defendants were mere conduits for the delivery of the kickbacks, "commissions," and other charges to SPS and/or their affiliates.

97.     These payments directly benefitted SPS or their affiliates and were taken to the detriment of the borrower.  The kickbacks and commissions, reinsurance arrangements, and subsidized costs were subsumed into the price of the insurance premium and ultimately paid by

the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed policies.

98.     Further, the SPS Defendants received financial benefits in the form of increased interest income, duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause, or "soft-dollar" credits.

99.     As a result, Plaintiffs and the Class have conferred a benefit on the SPS Defendants.

100.     These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

101.     These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against the SPS Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

**COUNT IV**

**UNJUST ENRICHMENT**
**(against Assurant, Standard Guaranty, and American Security)**

102.     Plaintiffs re-allege and incorporate paragraphs 1-77 above as if fully set forth herein and further allege as follows.

103.     The Assurant Defendants received from Plaintiffs and the Class members, benefits in the form of funds for insurance premiums related to force-placed insurance policies.

104.     The Assurant Defendants received below-cost payments from the SPS Defendants

for providing tracking services but included the entire cost of that tracking service in the premiums for force-placed insurance that were ultimately charged by SPS to the borrowers. The Assurant Defendants knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them but did not reduce the charges by the amounts paid to them from the SPS Defendants for the tracking services

105.    The Assurant Defendants paid significant monies to the SPS Defendants in kickbacks, commissions, reimbursements, and reinsurance tied directly to the cost of the force-placed insurance premium (as a percentage). Commissions or kickbacks were paid directly to the SPS Defendants in order to be able to exclusively provide force-placed insurance policies and receive the corresponding insurance premiums.

106.    The SPS Defendants also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

107.    The SPS Defendants were mere conduits for the delivery of funds for insurance premiums to the Assurant Defendants.

108.    As a result, Plaintiffs and the Class have conferred a benefit on the Assurant Defendants.

109.    These Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on them.

110.    These Defendants will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class

members, demand an award against the Assurant Defendants in the amounts by which these Defendants have been unjustly enriched at Plaintiffs' and the Class Members' expense, and such other relief as this Court deems just and proper.

## COUNT V

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
#### (Against SPS Defendants)

111.    Plaintiff Almanzar re-alleges and incorporates paragraphs 1-77 above as if fully set forth herein and further alleges as follows.

112.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

113.    SPS Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  The SPS Defendants had an exclusive relationship with their vendor and preferred insurance carrier, whereby they would pay unreasonable and inflated premiums for force-placed insurance policies, charge that amount to Plaintiff and the New Jersey Subclass, and then receive compensation through either kickback or captive reinsurance arrangements based on a percentage of the insurance policy's premium.

114.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiff and the New Jersey Subclass.  Assurant and ASIC, with the approval of the SPS Defendants, sent form letters to Plaintiff on SPS letterhead, stating that SPS would purchase or renew force-placed coverage if voluntary insurance was not secured

by a certain date.   Defendants represented in the letters that the costs of the insurance may be much higher than the cost of coverage the borrower could obtain on their own.

115.    In making this statement, Defendants deceived and misrepresented to Plaintiff and the New Jersey Subclass that the force-placed insurance premiums Defendants charged Plaintiff represented the "cost" of the policies.  In fact, such premiums were extraordinarily high because they also included kickbacks, reinsurance profits, and other wrongful benefits the SPS Defendants received from the Assurant Defendants.  Letters containing these misrepresentations, deceptive statements and false pretenses were sent to Plaintiff on October 3, 2012, June 6, 2013 and May 26, 2014.

116.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction.  N.J.S.A. 56:9-19.

117.    Plaintiff and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

118.    Plaintiff and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the SPS Defendants' unconscionable practices. The SPS Defendants had an exclusive relationship with the Assurant Defendants, whereby the Assurant Defendants would charge unreasonable and inflated premiums for force-placed insurance policies to Plaintiff and the New Jersey Subclass.  As compensation, the Assurant Defendants would kick back a set percentage of the inflated premiums to the SPS Defendants as a commission or enter into captive reinsurance agreements with the SPS Defendants as a means to funnel financial benefits to them. Pursuant to the terms of the standard

form mortgage agreements used by the SPS Defendants, SPS would purchase the required hazard coverage and charge the Plaintiff and New Jersey Subclasses escrow accounts for the premiums. Thus, as part of the scheme by Defendants, SPS charged Plaintiff and the New Jersey Subclass for the Assurant Defendants' inflated premiums caused by the kickbacks, reinsurance profits and other wrongful benefits they conveyed to the SPS Defendants.

119.    Plaintiff and the New Jersey Subclass have a private right of action against the SPS Defendants and entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person interest, as well as an award for reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

120.    Plaintiff and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff Juan Almanzar, on behalf of himself and the New Jersey Subclass, demands judgment against the SPS Defendants for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT VI

### VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT
### (Against Assurant Defendants)

121.    Plaintiff Almanzar re-alleges and incorporates paragraphs 1-77 above as if fully set forth herein and further alleges as follows.

122.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq.*, (the "NJCFA")

prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J.S.A 56:8-2.  "Sale" under the NJCFA includes any "sale . . . offer for sale . . . or attempt directly or indirectly to sell . . . or distribute."  N.J.S.A 56:8-1 (e).

123.   The Assurant Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  The Assurant Defendants had a relationship with the SPS Defendants, whereby they would charge unreasonable and inflated premiums for force-placed insurance policies to Plaintiff and the New Jersey Subclass.  As compensation, the Assurant Defendants would kick back a set percentage of the inflated premiums to the SPS Defendants as a commission or enter into captive reinsurance agreements with the SPS Defendants as a means to funnel financial benefits to them.

124.   Defendants made numerous misrepresentations in carrying out their scheme to defraud Plaintiff and the New Jersey Subclass.  Assurant and ASIC, with the approval of the SPS Defendants, sent form letters to  Plaintiff on SPS letterhead, stating that SPS would purchase or renew force-placed coverage if voluntary insurance was not secured.  Defendants represented in the letters that the costs of the insurance may be much higher than the cost of coverage the borrower could obtain on their own.  In making this statement, Defendants misrepresented to Plaintiff and the New Jersey Subclass that the force-placed insurance premiums Defendants charged Plaintiff represented the "cost" of the policies.  In fact, such premiums were extraordinarily high because they also included kickbacks, reinsurance profits, and other

wrongful benefits the Assurant Defendants provided to the SPS Defendants or their affiliates. Letters containing these misrepresentations, deceptive statements and false pretenses were sent to Plaintiff on October 3, 2012, June 6, 2013 and May 26, 2014.

125.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction."  N.J.S.A. 56:9-19.

126.    Plaintiff and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

127.    Plaintiff and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of the Assurant Defendant's unfair and unconscionable practices.  The standard form mortgage agreements used by the SPS Defendants includes a provision requiring the Plaintiff and the New Jersey Subclass to maintain hazard insurance coverage and in the event the coverage lapses, permits the lender to obtain force-placed coverage and charge the premiums to the Plaintiff.  In the Defendants letters to Plaintiff and the New Jersey Subclass, Defendants state that SPS would purchase the required hazard coverage and "[t]he premium for this policy/certificate will be added to the lien amount and the monthly mortgage payment will increase substantially."  Thus, as part of the scheme by Defendants, Plaintiff and the New Jersey Subclass were charged for the Assurant Defendants' inflated premiums caused by the kickbacks, reinsurance profits and other wrongful benefits they conveyed to the SPS Defendants.

128.    Plaintiff and the New Jersey Subclass have a private right of action against the Assurant Defendants and entitles them to recover, in addition to their actual damages, a threefold

award of the damages sustained by any person interest, as well as an award reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

129.    Plaintiff and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices

**WHEREFORE,** Plaintiff Juan Almanzar, on behalf of himself and the New Jersey Subclass, demands judgment against the Assurant Defendants for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT VII

## VIOLATIONS OF THE TRUTH IN LENDING ACT, 15 U.S.C. § 1601, *et seq.*
## (against SPS Defendants)

130.    Plaintiffs re-allege and incorporate paragraphs 1-77, above as if fully set forth herein and further allege as follows.

131.    Plaintiffs' and the Class Members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

132.    The SPS Defendants are "creditors" as defined by TILA because they owned or serviced Plaintiffs' mortgages and changed the terms of the mortgages so as to create a new mortgage obligation, of which the SPS Defendants were the creditors.

133.    Pursuant to TILA, the SPS Defendants were required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

134.    The SPS Defendants violated TILA, specifically 12 C.F.R. § 226.17(c), when

they: (i) added charges for force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, reinsurance, discount loan monitoring, or other profiteering involving the SPS Defendants or their affiliates as a result of the purchase of force-placed insurance.

135.    When the SPS Defendants changed the terms of Plaintiffs' mortgages to allow previously unauthorized kickbacks and insurance amounts in excess of the SPS Defendants' interests in the property, they changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance premiums, and thus created a new debt obligation.  Under TILA, the SPS Defendants were then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, the SPS Defendants increased the principal amount under Plaintiffs' mortgages when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

136.    The SPS Defendants adversely changed the terms of Plaintiffs' loan after origination in order to allow themselves or their affiliate to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  The SPS Defendants never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

137.    The SPS Defendants also violated TILA by adversely changing the terms of Plaintiffs' loans after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

138.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because the SPS

Defendants' kickback, reinsurance, and other unearned revenue-generating scheme was the subject of secret agreements among the SPS Defendants and their affiliates and was concealed from borrowers.

139.    Plaintiffs and Class Members have been injured and have suffered a monetary loss arising from the SPS Defendants' violations of TILA.

140.    As a result of SPS's TILA violations, Plaintiffs and Class members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

141.    Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the SPS Defendants, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against the SPS Defendants awarding actual damages and a penalty of $500,000.00 or 1% of SPS's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by the SPS Defendants, as provided by 15 U.S.C. § 1640(a)(3).

## <u>COUNT VIII</u>

### <u>TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP</u><br><u>(against Assurant, Standard Guaranty and American Security)</u>

142.    Plaintiffs re-allege and incorporate paragraphs 1-77, above as if fully set forth herein and further allege as follows.

143.    Plaintiffs and the Class members have advantageous business and contractual relationships with the SPS Defendants pursuant to the mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant premiums in bad faith for forced-place insurance.

144.    Assurant and its subsidiaries, including ASIC and SGIC, have knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and the SPS Defendants.  The Assurant Defendants are not parties to the mortgage contracts, nor are they third-party beneficiaries of the mortgage contracts.  Further, the Assurant Defendants do not have any beneficial or economic interest in the mortgage contracts.

145.    The Assurant Defendants intentionally, unjustifiably, and in bad faith interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with the SPS Defendants and their affiliates, whereby they provide compensation (unearned kickbacks, expense reimbursements, reinsurance, and low cost services) to the SPS Defendants in exchange for the exclusive right to force-place inflated and unnecessary premiums which are purposefully and knowingly charged to Plaintiffs and the Class.

146.    Plaintiffs and the Class have been damaged as a result of the Assurant's, SGIC's, and ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges for force-placed insurance in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members similarly situated, seek a judgment in their favor against the Assurant Defendants for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT IX

## BREACH OF FIDUCIARY DUTY
### (against SPS Defendants)

147.    Plaintiffs re-allege and incorporate paragraphs 1-77, above as if fully set forth

herein and further allege as follows.

148.     The SPS Defendants hold funds in escrow on behalf of borrowers whose mortgages they service.   These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

149.     The SPS Defendants are in a fiduciary relationship with Plaintiffs and the Class because the SPS Defendants receive a greater economic benefit from these transactions than they would from a typical escrow transaction.    Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when SPS took it upon themselves to manage borrowers' escrow accounts and then withdrew money from borrowers' escrow accounts to pay force-placed insurance premiums.   The SPS Defendants violated their fiduciary duties when they arranged to receive unlawful and unearned kickbacks or other compensation under the kickback scheme, which is clearly a greater economic benefit than what was contemplated under the mortgages.

150.     The SPS Defendants breached their fiduciary duties to Plaintiffs and other members of the proposed class by: (1) not acting in borrowers' best interest when they profited from force-placed insurance policies that were purchased using escrow funds they held for the benefit of Plaintiffs and Class members, at the expense of Plaintiffs and Class members; and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

151.     These actions were undertaken by the SPS Defendants in bad faith for their own benefit and were not intended to benefit these Plaintiffs or other proposed Class members.

152.     As a direct result of the SPS Defendants' actions and subversion of Plaintiffs' interest to their own in reaping extravagant and outrageous fees, Plaintiffs and all others

similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

**WHEREFORE**, Plaintiffs and the proposed class are entitled to damages for the SPS Defendants' breaches of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because the SPS Defendants acted in bad faith in deliberate or reckless disregard of both their rights and the SPS Defendants' obligation to hold their escrow funds in trust.

<u>COUNT X</u>

<u>Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §
1962(c)
(against all Defendants)</u>

153.    Plaintiffs re-allege and incorporate paragraphs 1-77 of this complaint as if fully set forth herein.

154.    At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c).

155.    The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included SPS, Assurant, SGIC, and ASIC.

156.    The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class Members to pay unreasonably high amounts for force-placed insurance through a scheme that inflated such charges to cover

kickbacks and expenses associated with monitoring SPS's entire loan portfolio. Defendants shared the bounty of their enterprise, i.e., by sharing the amounts charged to borrowers for force-placed insurance premiums generated by the joint scheme.

157.    The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

158.    SPS, Credit Suisse, Assurant, SGIC, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that lasted more than one year, at a minimum, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

159.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the intent to defraud and deceive Plaintiffs and Class members.

160.    For example, Assurant, SGIC, and ASIC, with the approval of the SPS Defendants, sent form letters to Plaintiffs on SPS letterhead, stating that SPS would purchase or renew force-placed coverage if voluntary insurance was not secured.   These Defendants represented in the letters that SPS would purchase the required coverage and charge the borrower the "cost" of the insurance.  In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the true "cost" of the policies, when in fact such charges also included unearned kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost servicing, and other compensation returned the SPS Defendants or their affiliates.

Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably high amounts for premiums and would have influenced Plaintiffs' decision whether to pay the amounts or contest them.  Letters such as these were sent to Plaintiff Almanzar on October 3, 2012, June 6, 2013 and May 26, 2014. Letters such as these were also sent to Plaintiff Evans on August 19, 2013 and June 16, 2014.

161.    Assurant and ASIC, with the approval of the SPS Defendants and on SPS letterhead also sent Plaintiffs and the Class members force-placed insurance notices informing them that force-placed insurance had been purchased.   The letters represented that "[t]he premium for this policy/certificate will be added to your lien amount and the monthly mortgage payment will increase substantially" or that "[t]he premium for this policy/certificate will be charged to your escrow account."  Letters including this misrepresentation were sent to Plaintiff Almanzar on October 3, 2012 and May 26, 2014 and Plaintiff Evans on August 19, 2013 and June 16, 2014.

162.    The Assurant Defendants, with the approval of SPS, also sent form letters to Plaintiffs on SPS letterhead, stating that SPS would purchase force-placed coverage if voluntary insurance was not secured.   These Defendants represented in the letters that the costs of the insurance may be much higher than the cost of coverage you could obtain on your own.   In making these statements, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the true "cost" of the policies.   In fact, the amounts charged to Plaintiffs were extraordinarily high because they also included kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned

to SPS or their affiliates.  Defendants had a duty to correct this mistaken impression. The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably high premiums and would have influenced Plaintiffs' decisions whether to pay the premiums or contest them.  One such letter was sent to Plaintiff Almanzar on June 6, 2013 and Plaintiff Evans on August 19, 2013.

163.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance premiums. Defendants also transferred sums among themselves, including but not limited to kickbacks in various forms, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

164.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high charges for force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

### COUNT XI

### Violation of Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(d) (against all Defendants)

165.    Plaintiffs re-allege and incorporate paragraphs 1-77 and 154-164 of this complaint as if fully set forth herein.  Plaintiffs further allege as follows.

166.    At all relevant times, Defendants were associated with the enterprise and agreed

and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

167.     Defendants agreed that SGIC, ASIC, and Assurant would be SPS's exclusive force-placed insurance providers and that unreasonably high amounts for force-placed insurance premiums would be extracted from SPS's customers.  Defendants also agreed that the Assurant Defendants would pay unearned kickbacks in the form of "commissions," direct payments, "expense reimbursements," and below-cost services to SPS or their affiliates.

168.     The SPS Defendants' affiliates pass much of their profits from this scheme back to SPS and Credit Suisse.

169.     ASIC and SGIC pass much of their profits from this scheme to Assurant.

170.     Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

171.     As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE,** Plaintiffs and Class Members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and

declaring Plaintiffs and their counsel to be representatives of the Class and the New Jersey Subclass;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of the SPS Defendants' breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiff Almanzar and the New Jersey Subclass actual and treble damages, injunctive relief, declaratory relief, pre- and post-judgment interest, attorneys' fees and costs under the NJCFA;

(7)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant Defendants' interference;

(8)     Awarding actual damages and a penalty of $500,000.00 or 1% of the  SPS Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 11th day of July, 2014.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>rn@kttlaw.com<br>**KOZYAK, TROPIN, &**<br>**THROCKMORTON P.A.**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:   (305) 372-3508<br>*Counsel for Plaintiffs* | Aaron S. Podhurst, Esq.<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>jgravante@podhurst.com<br>Matthew Weinshall<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiffs* |
| Lance A. Harke, Esq.<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:     (305) 536-8220<br>Facsimile:      (305) 536-8229<br>*Counsel for Plaintiffs* | William F. Merlin, Jr., Esq.<br>wmerlin@merlinlawgroup.com<br>FL Bar No. 364721<br>Mary E. Fortson, Esq.<br>mfortson@merlinlawgroup.com<br>FL Bar No. 114596<br>Sean Shaw, Esq.<br>sshaw@merlinlawgroup.com<br>FL Bar No. 0690988<br>Phillip Sanov, Esq.<br>psanov@merlinlawgroup.com<br>*Pro Hac Vice* Pending<br>**MERLIN LAW GROUP, P.A**.<br>777 South Harbour Island Blvd., Suite 950<br>Tampa, FL 33602<br>Telephone: (813) 229-1000<br>Fax: (813) 229-3692 |

355285

47

|  | *Counsel for Plaintiffs* |
|---|---|
| Archie Lamb, Jr., Esq.<br>Of Counsel<br>**ARCHIE LAMB & ASSOCIATES, LLC**<br>P.O. Box 2088<br>Birmingham, Alabama 35201<br>Telephone: (205) 612-6789<br>*Counsel for Plaintiffs* | Catherine E. Anderson, Esq.<br>canderson@gslawny.com<br>Oren S. Giskan, Esq.<br>ogiskan@gslawny.com<br>**GISKAN SOLOTAROFF**<br>**ANDERSON & STEWART, LLP**<br>11 Broadway, Suite 2150<br>New York, NY 10004<br>Telephone: (212) 847-8315<br>Facsimile: (646) 520-3236<br>*Counsel for Plaintiffs* |
| Roosevelt N. Nesmith, Esq.<br>roosevelt@nesmithlaw.com<br>**LAW OFFICE OF**<br>**ROOSEVELT N. NESMITH, LLC**<br>300 Broadacres Drive, Suite 410<br>Bloomfield, NJ 07043<br>Telephone: (973) 259-6990<br>Facsimile: (866) 848-1368<br>*Counsel for Plaintiffs* | Michael R. Sices, Esq.<br>michael@siceslaw.com<br>**LAW OFFICE OF MICHAEL R SICES**,<br>PC<br>2000 N. Central Expressway, Suite 209<br>Plano, Texas 75074<br>972.914.8372(office)<br>972.360.3264(fax)<br>*Counsel for Plaintiffs* |

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 11th day of July, 2014 and served by the same means on all counsel of record.

By:   */s/ Adam M. Moskowitz*

355285

48