**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 14-CIV-22586-MORENO**

JUAN ALMANZAR, and
JOCELYN EVANS on behalf
of themselves and all others
similarly situated,

    Plaintiffs,

                 **CLASS ACTION**
v.                 **JURY DEMAND**

SELECT PORTFOLIO SERVICING, INC.,
STANDARD GUARANTY
INSURANCE COMPANY, and
AMERICAN SECURITY INSURANCE
COMPANY,

    Defendants.
_____/

**FIRST AMENDED CLASS ACTION COMPLAINT**

   Plaintiffs file this class action complaint on behalf of themselves, and all others similarly situated against SELECT PORTFOLIO SERVICING, INC. ("Select Portfolio"), STANDARD GUARANTY INSURANCE COMPANY ("SGIC") and AMERICAN SECURITY INSURANCE COMPANY ("ASIC") (together the "Assurant Defendants").

**INTRODUCTION**

**The Rise of Force-Placed Insurance Schemes**

   1.  Many years ago, Assurant, Inc. and its subsidiaries, including ASIC and SGIC, and major mortgage lenders devised a fraudulent scheme whereby Assurant's subsidiaries would offer loan-tracking and insurance-placement services to the lenders and pay them unearned kickbacks (essentially bribes) in exchange for an exclusive contractual relationship. The

kickbacks to the lenders and mortgage servicers take many forms, and are often characterized as legitimate payments to conceal their actual purpose from consumers.   For example, the kickbacks are often characterized as "commissions" paid to an affiliate of the lender for brokerage services, but are in fact cycled through the affiliate, which does no work in connection with the borrower's forced placement, and paid back to the lender as pure profit.  Kickbacks may also take the form of captive reinsurance arrangements, direct payments, "expense reimbursements," debt forgiveness, or discounted administrative services.   Over time, these schemes have reaped the major mortgage lenders and the Assurant Defendants hundreds of millions of dollars in illegal and unearned profits.[1]

2.      Assurant, its subsidiaries, and mortgage lenders and servicers concealed these fraudulent practices from the public for many years, but the true nature of these schemes has recently been uncovered, in no small part due to considerable discovery conducted in numerous class actions lawsuits across the country (many before this Court), investigations by the Florida, California, and New York insurance regulators, and an investigation conducted by Fannie Mae and Freddie Mac (the federal agencies that guarantee more than 80% of all American homeowner mortgages).[2]

3.      Mortgage lenders and services have been litigating force-placed insurance claims brought in class action lawsuits for more than three years, and have failed to procure dismissal in

---

[1] A similar fraudulent FPI scheme was initiated by the other major force-placed insurer - QBE Insurance Group.

[2]   These investigations and lawsuits revealed that: (1) every mortgage contract included a provision that allowed the bank/servicer to force-place insurance if the coverage lapsed, (2) many homeowners had such coverage lapse, (3) the contracts do not specify the actual "cost" of the force-placed insurance, and (3) Fannie Mae and Freddie Mac guaranteed the majority of the mortgages, so that if the homeowner did not pay such charges the government would eventually pay such amounts.

the vast majority of the cases they have defended.[3]

4.     As a result of discovery taken in prior FPI cases, as well as investigations by state regulators, mortgage lenders and servicers are beginning to curb their practices.  Moreover, Fannie Mae and Freddie Mac recently announced that they will require mortgage servicers to certify that they no longer participate in many of the illegal practices alleged herein in connection with any of their mortgages.

5.     While these new restrictions may help homeowners, this case against the Assurant Defendants and Select Portfolio remains necessary because: (1) most state and federal investigations did not result in monetary relief to injured homeowners from across the country, (2) new state restrictions apply mainly to residents in Florida, California, and New York only, and (3) the federal restrictions can be amended at any time in the future.  This case is brought to provide monetary relief to the homeowner victims, and ensure that ASIC, SGIC, and Select Portfolio are enjoined by this Court from continuing these illegal practices nationwide.

## Select Portfolio Background

6.     Select Portfolio is a loan servicing company founded in 1989 as Fairbanks Capital Corp. with operations in Salt Lake City, Utah, and Jacksonville, Florida.  Select Portfolio Servicing was created as a Utah company in 1989.

7.     In November 2003, Fairbanks Capital Corp. and Fairbanks Capital Holding Corp. agreed to pay $40 million to settle with the Federal Trade Commission (FTC) and the U.S. Department of Housing and Urban Development (HUD), which charged them with engaging in a number of unfair, deceptive, and illegal practices in the servicing of subprime mortgage loans.

---

3   *See e.g. Hamilton v. SunTrust Mortg. Inc.,* No. 13-cv-60749-JIC 2014 U.S. Dist. LEXIS 41688 (S.D. Fla. Mar. 25, 2014); *Williams v. Wells Fargo Bank*, *N.A.*, No. 11-cv-21233-CMA, 2011 WL 4368980 (S.D. Fla. Sept. 19, 2011).

The Commission distributed the $40 million as redress to affected consumers. The settlement also imposed a number of specific limitations on Fairbanks's ability to charge fees and engage in certain practices when servicing mortgage loans. In mid-2004, Fairbanks changed its name to Select Portfolio Servicing, Inc.

8.      In 2005, Credit Suisse First Boston (USA), Inc. now known as Credit Suisse, purchased Select Portfolio Servicing and its parent holding company for $144.4 million.

9.      In 2007, the FTC conducted a review of Select Portfolio Servicing's compliance with certain aspects of the 2003 settlement. The FTC and Select Portfolio Servicing negotiated and agreed to several modifications of the settlement.

10.     The company specializes in providing, servicing and buying of the sub-prime mortgages. It is one of the leaders in the sub-prime mortgage industry.

**Select Portfolio and the Assurant Defendants' Force-Placed Insurance Program**

11.     Select Portfolio procures millions of dollars in force-placed insurance coverage annually from ASIC and SGIC, and subsequently charges borrowers amounts that included the cost of insurance plus the illegal bribes and kickbacks.

12.     Defendants' scheme works as follows.   Select Portfolio purchases master insurance policies that cover all of its mortgage loans.  In exchange, ASIC and SGIC are given the exclusive right to force insurance on property securing a loan within the portfolio when the borrower's insurance lapses or the lender determines the borrower's existing insurance is inadequate.   ASIC and SGIC monitor Select Portfolio's entire loan portfolio for lapses in borrowers' insurance coverage.  Once a lapse is identified, the Assurant Defendants, send notice to the borrower that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues, the insurer notifies the borrower that insurance is being

force-placed at his or her expense.

13.     Select Portfolio charges borrowers more than the actual cost (and thus more than what it actually pays) for force-placed coverage, and thus charges borrowers more than the amount necessary to cover its own interest in the collateral for borrowers' mortgage loans.  The charges passed on to borrowers are artificially inflated by Select Portfolio and the Assurant Defendants to include the cost of bribes and some of the other unearned benefits identified above, all of which are simply kickbacks paid by the Assurant Defendants to Select Portfolio to maintain an exclusive relationship.  Select Portfolio also passes on charges to the homeowners for unnecessary or duplicative coverage that is required neither by law nor the terms of the borrowers' mortgage loans.  These are all direct benefits to the Defendants.

14.     Plaintiffs here do not challenge the right of the Defendants to place insurance coverage in the first instance, nor do they challenge the rates that ASIC and SGIC file with any state insurance agency.  Instead, Plaintiffs challenge Select Portfolio's abuses of the discretion and duties afforded to it in its mortgage contracts and Defendants' manipulation of the force-placed insurance process to maximize their own profits.  Plaintiffs seek to recover the improper charges passed on to them and other Select Portfolio borrowers nationwide through their claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, breach of fiduciary duty, tortious interference with a contract or advantageous business relationship, and violations of the New Jersey Consumer Fraud Act, and federal Truth in Lending Act ("TILA"), and Racketeer Influenced and Corrupt Organizations Act ("RICO").

15.     The money to finance the force-placed insurance schemes comes from unsuspecting borrowers like Plaintiffs who were charged inflated amounts for force-placed insurance by lenders or servicers – Select Portfolio here.  In many instances, borrowers are

required to pay for backdated insurance coverage to cover periods during which no claims were made, or coverage that exceeds the legal requirements, and are charged additional improper costs.

16.     The major lenders and servicers such as Select Portfolio collude with the ASIC and SGIC to manipulate the force-placed insurance market for their own gain, leading to higher prices for force-placed insurance, which servicers then charge to borrowers.  Lenders, servicers, and force-placed insurers reap these unconscionable profits entirely at the expense of the unsuspecting borrower.

17.     At a recent hearing on force-placed insurance held by the National Association of Insurance Commissioners ("NAIC"), Birny Birnbaum, the foremost expert on the force-placed insurance market, illustrated the staggering growth in profits that Defendants' schemes have reaped in recent years:[4]

### LPI Premiums Have Quadrupled Since 2004

| Year | Gross Written Premium ($ Millions) | Net Written Premium ($ Millions) |
|------|-----------------------------------|----------------------------------|
| 2004 | $1,485 | $796 |
| 2005 | $1,832 | $919 |
| 2006 | $2,163 | $1,074 |
| 2007 | $3,058 | $1,647 |
| 2008 | $4,000 | $2,209 |
| 2009 | $5,181 | $3,049 |
| 2010 | $5,915 | $3,223 |
| 2011 | $5,692 | $3,450 |
| 2004-2011 | $29,326 | $16,368 |

2009-2011 GWP Understated, Reporting Errors by QBE

CEJ LPI Presentation to NAIC                                    13                                    August 9, 2012

---

[4] This graph and the ones that follow were taken from Mr. Birnbaum's presentation to the NAIC on August 9, 2012.  The presentation is available at:
http://www.naic.org/documents/committees_c_120809_public_hearing_lender_placed_insurance_presentation_birnbaum.pdf.

18.     Assurant Inc., through its operating subsidiaries, like ASIC and SGIC here, is one of the two major insurance companies that control virtually the entire market for force-placed insurance. As shown below, Assurant held 58.6% of the nationwide market share for force-placed insurance in 2011.  Together, Assurant and QBE/Balboa, the other major insurer with a significant market share, controlled 99.7% of the market in the same year, and held no less than 96.1% of the market between 2004 and 2011.  Large mortgage lenders and servicers sustain the insurers' monopoly by agreeing to purchase all force-placed insurance from the two insurers in exchange for kickbacks or bribes disguised as "commissions," "expense reimbursements," direct payments, or the other benefits identified above.

### Assurant and QBE Are the Market for LPI: Countrywide Market Share

| Year | Assurant | QBE/Balboa | Assurant + QBE/Balboa |
|------|----------|------------|-----------------------|
| 2004 | 68.2% | 29.8% | 98.0% |
| 2005 | 69.7% | 26.4% | 96.1% |
| 2006 | 79.2% | 19.5% | 98.7% |
| 2007 | 74.0% | 25.4% | 99.4% |
| 2008 | 74.2% | 25.5% | 99.7% |
| 2009 | 57.2% | 42.4% | 99.7% |
| 2010 | 56.2% | 43.5% | 99.7% |
| 2011 | 58.6% | 41.1% | 99.7% |

CEJ LPI Presentation to NAIC                    18                              August 9, 2012

19.     It is no surprise that these Defendants' practices have come under increased scrutiny in recent years by the government and state regulators.  For example:[5]

---

[5] These practices have also come under increased scrutiny by the courts.  This Court has already certified a Florida class against Wells Fargo Bank, N.A. and Wells Fargo Insurance, Inc. (as well as their exclusive force-placed insurance carrier, QBE) – on the same practices described here. *See Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233, 280 F.R.D. 665 (S.D. Fla. 2012).

357717                                          7

- On March 21, 2013, the New York Department of Financial Services' ("NYDFS"), investigation into force-placed insurance practices "produced a major settlement with the country's largest 'force-placed' insurer, Assurant, Inc. . . . [The settlement] includes restitution for homeowners who were harmed, a $14 million penalty paid to the State of New York, and industry-leading reforms that will save homeowners, taxpayers, and investors millions of dollars going forward through lower rates."[6] Further, under the Consent Order entered, Assurant and its subsidiaries (including ASIC), are prohibited from paying commissions to any servicers or entity affiliated with a servicer on force-placed insurance policies obtained by the servicer.  *See* Assurant & NYDFS Consent Order, Mar. 21, 2013, at 9.

- At NYDFS hearings on May 17, 2012 related to the force-placed insurance market, the Superintendent of Financial Services, Benjamin Lawsky, stated that the Department's initial inquiry uncovered "serious concerns and red flags" which included: 1) exponentially higher premiums, 2) extraordinarily low loss ratios, 3) lack of competition in the market, and 4) tight relationships between the banks, their subsidiaries, and insurers.  He went on to state:

    > In sum when you combine [the] close and intricate web of relationships between the banks and insurance companies on the one hand, with high premiums, low loss ratios, and lack of competition on the other hand, it raises serious questions . . . .

- As a result of its investigation, the NYDFS recently stated that "insurers offered financial incentives to mortgage servicers and their affiliates, including commissions to servicer-affiliated insurance producers who performed little or no work, and entered into arrangements that transferred a significant percentage of force-placed insurance profits to affiliates of servicers,"  and that "[t]hese practices not only artificially inflated premiums charged to homeowners, but created a conflict of interest in that servicers had an incentive to purchase more costly force-placed insurance where they earned a portion of the premiums or profits from the placement of force-placed insurance."[7]

- After the August 2012 NAIC hearings, the state regulator from Louisiana, James Donelon, referred to the force-placed insurance market as a "monopoly" and

---

[6] *See Cuomo Administration Settles with Country's Largest Force-Placed Insurer, Leading Nationwide Reform Effort and Saving Homeowners, Taxpayers, and Investors Millions of Dollars*, Dep't of Fin. Servs., Mar. 21, 2013, *available at,* http://www.dfs.ny.gov/about/press2013/pr1303211.htm.

[7] *See* NYDFS Proposed 11 NYCRR 227: Regulation of Force-Placed Insurance.

stated that stricter regulations may be needed.[8]

- On December 18, 2013, Fannie Mae issued its Servicing Guide Announcement related to force-placed insurance that, among other things, prohibits servicers from including any commissions, bonuses, or other incentive compensation in the amounts charged to borrowers for force-placed insurance and further requires that the force-placed insurance carrier cannot be an affiliated entity of the servicer.[9]

20.    Florida has now become the epicenter for these force-placed insurance schemes. In his presentation to the NAIC, Mr. Birnbaum illustrated the astounding rise in force-placed insurance policies in Florida:

### LPI Premium by State:  Florida Has Become Ground Zero

|     | 2004  | 2005  | 2006  | 2007  | 2008  | 2009  | 2010  | 2011  |
|-----|-------|-------|-------|-------|-------|-------|-------|-------|
| FL  | 10.6% | 10.8% | 13.3% | 17.9% | 22.9% | 34.3% | 36.7% | 35.1% |
| CA  | 20.8% | 19.3% | 21.2% | 23.5% | 24.3% | 14.0% | 11.1% | 10.2% |
| TX  | 10.6% | 10.7% | 8.8%  | 8.7%  | 7.0%  | 5.6%  | 5.6%  | 6.1%  |
| NY  | 3.6%  | 3.6%  | 4.5%  | 4.4%  | 4.3%  | 4.7%  | 5.4%  | 5.6%  |
| IL  | 3.0%  | 3.3%  | 3.9%  | 3.7%  | 3.9%  | 4.4%  | 4.1%  | 4.6%  |
| NJ  | 2.9%  | 2.7%  | 2.9%  | 2.7%  | 2.7%  | 2.9%  | 3.4%  | 4.0%  |
| MI  | 4.2%  | 4.4%  | 4.4%  | 5.8%  | 3.6%  | 2.7%  | 2.2%  | 2.0%  |
| OH  | 3.6%  | 3.8%  | 3.5%  | 2.7%  | 2.4%  | 2.2%  | 2.3%  | 2.9%  |
| GA  | 3.4%  | 3.2%  | 3.2%  | 2.4%  | 2.3%  | 2.3%  | 2.3%  | 2.3%  |
| PA  | 2.6%  | 2.6%  | 2.7%  | 1.8%  | 1.8%  | 1.8%  | 1.7%  | 1.8%  |

CEJ LPI Presentation to NAIC                              15                              August 9, 2012

21.    As a result, Florida has more forced-placed victims than any other state. Moreover, all of the force-placed actuary rates, including the embedded unearned kickbacks, were set by the Assurant Defendants – operating as Assurant Specialty Property – through their actuary department located in Miami, Florida.

---

[8] *See* Z. Tracer & D. Beasley, *U.S. Regulators to Examine Forced-Place Insurance*. BLOOMBERG BUSINESSWEEK, Aug. 10, 2012, *available at*, http://www.bloomberg.com/news/2012-08-10/u-s-regulators-to-examine-forced-place-insurance.html.

9 *See* https://www.fanniemae.com/content/announcement/svc1327.pdf

357717                                         9

22.     Defendants' self-dealing and collusion in the force-placed insurance market has caused substantial harm to the named Plaintiffs and the proposed class they seek to represent. This class action seeks to redress that harm on behalf of these classes of consumers and to recover all improper costs they have incurred related to the forced placement of insurance by Select Portfolio, SGIC, and ASIC.

## PARTIES

### Plaintiffs

23.     Plaintiff JUAN ALMANZAR is a citizen of the State of New Jersey.  He is a natural person over the age of 21 and otherwise *sui juris*.

24.      Plaintiff JOCELYN EVANS is a citizen of the State of Texas.  She is a natural person over the age of 21 and otherwise *sui juris*

### Defendants

25.     Defendant AMERICAN SECURITY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Atlanta, Georgia.  American Security often operates under the trade name "Assurant Specialty Property."  American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

26.     Defendant STANDARD GUARANTY INSURANCE COMPANY is a Delaware corporation and an indirect subsidiary of Assurant, writing force-placed insurance policies in all fifty states and the District of Columbia with its principal address in Georgia.  Standard Guaranty

also often operates under the trade name "Assurant Specialty Property."  Standard Guaranty along with American Security contracts with the lenders to act as a force-placed insurance vendor.  Its duties include, but are not limited to, tracking loans in their mortgage portfolio, handling all customer service duties related to force-placed insurance, and securing force-placed insurance policies on properties when a borrower's insurance has lapsed.

27.    Upon information and belief, Assurant, Inc. owns the "Assurant Specialty Property" trade name and allows its subsidiaries (including ASIC and SGIC) to operate their force-placed insurance business under that name.

28.    Defendant SELECT PORTFOLIO SERVICING, INC., is a Utah corporation and a residential loan servicing company with office operations in Jacksonville, Florida and Salt Lake City, Utah.  Upon information and belief, SELECT PORTFOLIO SERVICING, INC. is the former Fairbanks Capital Corporation, which changed its name to Select Portfolio Servicing, Inc., in June 2004.  Select Portfolio Servicing regularly conducts business in the State of Florida and throughout the United States.

<u>**JURISDICTION AND VENUE**</u>

29.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (codified in various sections of 28 U.S.C.).

30.    Plaintiffs are citizens of the States of New Jersey and Texas.  Defendants are citizens of various other states but are registered to do business in Florida.  The amount in controversy exceeds $5,000,000 and there are at least one hundred members of the putative class.

31.    This Court has jurisdiction over Defendants because they are foreign corporations authorized to conduct business in Florida, are doing business in Florida and have registered with

the Florida Secretary of State, or do sufficient business in Florida, have sufficient minimum contacts with Florida, or otherwise intentionally avail themselves of the Florida consumer market through the promotion, marketing, sale, and service of mortgages or other lending services and insurance policies in Florida.  This purposeful availment renders the exercise of jurisdiction by this Court over Defendants and their affiliated or related entities permissible under traditional notions of fair play and substantial justice.

32.     In addition, this Court has subject-matter jurisdiction under CAFA because the amount in controversy exceeds $5 million and diversity exists between Plaintiffs and the Defendants.  28 U.S.C. § 1332(d)(2).  Further, in determining whether the $5 million amount in controversy requirement of 28 U.S.C. § 1332(d)(2) is met, the claims of the putative class members are aggregated.  28 U.S.C. § 1332(d)(6).

33.     Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendants transact business and may be found in this District.  Venue is also proper here because at all times relevant hereto, and a substantial portion of the practices complained of herein occurred in the Southern District of Florida.

34.     All conditions precedent to this action have occurred, been performed, or have been waived.

## FACTUAL ALLEGATIONS

35.     Permitting a lender to forcibly place insurance on a mortgaged property and charge the borrower the cost of the insurance is neither a new concept nor a term undisclosed to borrowers in mortgage agreements.  The standard form mortgage agreements used by Select Portfolio include a provision requiring the borrower to maintain hazard insurance coverage, flood insurance coverage if the property is located in a Special Flood Hazard Area as determined

by the Federal Emergency Management Agency, and wind insurance on the property securing the loan, and in the event the insurance lapses, permit the lender to obtain force-placed coverage and charge the cost of that insurance coverage to the borrower rather than declare the borrow in default.

36.     What is unknown to borrowers and not disclosed in the mortgage agreements or by the Defendants, is that the Select Portfolio has exclusive arrangements with ASIC and SGIC to manipulate the force-placed insurance process and artificially inflate the amounts charged to borrowers.  The amounts charged to borrowers are inflated to provide Select Portfolio and its affiliates with kickbacks disguised as "commissions," reinsurance payments, "expense reimbursements," direct payments, debt forgiveness, or to cover the cost of discounted services, as well as to include other unmerited charges.  The borrower is then forced to pay the inflated charges.

**The Defendants' Force-Placed Insurance Scheme**

37.     ASIC and SGIC have exclusive arrangements with Select Portfolio to monitor its mortgage portfolio for lapses in insurance at below cost and provide force-placed insurance.   In addition to subsidized mortgage services received from the Assurant Defendants, a percentage of borrowers' force-placed insurance charges are "kicked back" and paid directly to Select Portfolio or its affiliates – and then shared with Select Portfolio often in the form of "soft dollar credits." Select Portfolio receives additional kickbacks through, expense reimbursements, reinsurance, debt forgiveness, or direct payments. The kickbacks described here are not paid for legitimate purposes, they are simply bribes paid by ASIC and SGIC to keep their exclusive relationship with Select Portfolio.

38.     Once a lapse is identified, ASIC or SGIC starts an automatic letter cycle of

notices to each borrower, on letterhead purporting to come from Select Portfolio, asking for proof of insurance and stating that insurance will be "purchased" and force-placed if the voluntary coverage is not continued.  If a lapse continues or proof of insurance is not submitted, the insurer notifies the borrower, once again on Select Portfolio letterhead, that insurance is being force-placed at his or her expense and issues an insurance certificate pursuant to the master policy.

39.     The letters or notices sent to borrowers are done pursuant to an automated system used by ASIC and SGIC that generates and sends the letters at pre-determined times.  The letters indicate an address for borrowers to submit proof of insurance or correspondence to Select Portfolio, however, the address is actually for an ASIC and SGIC location because they are performing these services for Select Portfolio. Each borrower is subject to the Defendants' automated system and receives materially the same letters described above.

40.     No individualized underwriting ever takes place for the force-placed coverage. Insurance is automatically placed on the property and after Select Portfolio pays for the force-placed insurance, it passes along the charges to the borrower.   In many instances, the insurance lapse is not discovered for months or even years after the fact.  However, due to the terms of the master policy between the Defendants, coverage is placed on the date of the alleged lapse (despite what the notices state), and even though there were no claims or damage to the property during the period of lapse, the borrower is billed retroactively for the insurance placed on the property and the borrower is charged for the "cost" of the past coverage.

41.     Once coverage is forced on the property, Select Portfolio pay the insurer and charges the borrower for the payment, which is either deducted from the borrower's mortgage escrow account, sometimes by the Assurant Defendants, or added to the balance of the

borrower's loan.  The borrower's escrow account is depleted irrespective of whether other escrow charges, such as property taxes, are also due and owing.  On some occasions, when a borrower does not have an escrow account, the lender creates an escrow account with a negative balance and charges the borrower to bring the balance to zero.

42.     Select Portfolio pays the premiums to the insurers who then kick back a set percentage to Select Portfolio or its affiliate as a "commission."   As described above, any payments made to an affiliate is shared with Select Portfolio.

43.     The money paid back to Select Portfolio and its affiliates is not given in exchange for any services provided by them; it is simply grease paid to keep the force-placed machine moving.  In an attempt to disguise the kickback as legitimate, ASIC and SGIC send notices to borrowers on Select Portfolio letterhead that disclose that Select Portfolio affiliates may earn commissions or income as a result of obtaining a force-placed policy through that affiliate.

44.     In reality, however, no work is ever done by Select Portfolio or its affiliates to procure insurance for that particular borrower because the coverage comes through the master policy already in place.  Select Portfolio does not contact the borrowers, does not seek out individual insurance policies on their behalf, and has no involvement in the placing of the insurance.  As a result, the amount paid is not a true "commission," no income is "earned," and Select Portfolio does not incur any costs in relation to the force-placement of insurance for any particular borrower.

45.     The Defendants have simply labeled this kickback as a "commission" to disguise its true nature – a bribe to keep their exclusive relationship in place.

46.      In addition, upon information and belief, the Assurant Defendants will enter into essentially riskless "captive reinsurance arrangements" with Select Portfolio or its affiliates to

"reinsure" the property insurance force-placed on borrowers.  A recent *American Banker* article

illustrated this reinsurance problem using JPMorgan Chase's program by way of example:

> JPMorgan and other mortgage servicers reinsure the property insurance
> they buy on behalf of mortgage borrowers who have stopped paying for
> their own coverage. In JPMorgan's case, 75% of the total force-placed
> premiums cycle back to the bank through a reinsurance affiliate. This has
> raised further questions about the force-placed market's arrangements. . . .
>
> Over the last five years, Chase has received $660 million in reinsurance
> payments and commissions on force-placed policies, according to New
> York's DFS. . . .
>
> Of every hundred dollars in premiums that JPMorgan Chase borrowers
> pay to Assurant, the bank ends up keeping $58 in profit, DFS staff
> asserted. The agency suggested the bank's stake in force-placed insurance
> may encourage it to accept unjustifiably high prices by Assurant and to
> avoid filing claims on behalf of borrowers, since that would lower its
> reinsurer's returns.
>
> The DFS staff also questioned the lack of competition in the industry,
> noting that Assurant and QBE have undertaken acquisitions that give them
> long-term control of 90% of the market.  Further limiting competition are
> the companies' tendency to file identical rates in many states, Lawsky and
> his staff argue.

J. Horwitz, *Chase Reinsurance Deals Draw New York Regulator's Attacks*, AM. BANKER, May

18, 2012, *available at* http://www.americanbanker.com/issues/177_97/chase-reinsurance-deals-

regulator-attack-1049460-1.html

      47.    Select Portfolio's reinsurance program, like those of other lenders, is simply a

way to funnel profits, in the form of ceded premiums, to Select Portfolio or its affiliates at

borrowers' expense.  While reinsurance can, and often does, serve a legitimate purpose, here it

does not.  On information and belief, Select Portfolio and its affiliates enter into reinsurance

agreements with the Assurant Defendants that provide that the insurer will return to the Select

Portfolio affiliates significant percentages of the force-placed insurance charges by way of ceded

reinsurance premiums.  The ceded premiums are nothing more than a kickback to Select Portfolio

16

and its affiliates and a method for Defendants to profit from the forced placement of new coverage.  Indeed, while the Select Portfolio or its affiliates purportedly provided reinsurance, they did not assume any real risk

48.     The Defendants also enter into agreements for ASIC and SGIC to provide servicing activities on the Select Portfolio entire loan portfolio at below cost.  These servicing costs are recouped through the force-placed amounts ultimately charged to the borrower.

49.     The per loan fee paid by Select Portfolio to the Assurant Defendants is much less than what it would have cost Select Portfolio to perform these functions themselves.

50.     The fee was also less than the true cost of these services to ASIC and SGIC. They are able to provide these services at below cost because of the enormous profits they make from force-placed insurance where they have inflated the premiums to cover the cost of providing these services and know that the inflated amounts will be ultimately charged by Select Portfolio to the borrower.

51.     ASIC and SGIC are able to provide these services at below cost because of the enormous profits they make from the high cost insurance charged for force-placed insurance. However, because insurance-lapsed mortgaged property comprises only 1-2% of the lenders' total mortgage portfolio, the borrowers who pay these charges unfairly bear the entire cost to service the entire loan portfolio.  These charges, passed on to Plaintiffs and the proposed class, are not properly chargeable to the borrower because they are expenses associated with the servicing of all the loans and the loan servicers are already compensated for these activities by the owners of the loans.

52.     The small percentage of borrowers who are charged for force-placed insurance shoulder the costs of monitoring Select Portfolio's entire loan portfolio, effectively resulting in a

kickback.

53.    As noted above, ASIC and SGIC provide millions of dollars in kickbacks to Select Portfolio in additional ways including, "expense reimbursements," and direct payments. Similar to the "commissions" and reinsurance described above, these funds are actually nothing more than another means for ASIC and SGIC to pay bribes to Select Portfolio for the exclusive right to force-place insurance on its borrowers.

54.    Select Portfolio also overcharges borrowers by disregarding the Standard Mortgage Clause or the Lender's Loss Payable Endorsement ("LLPE") in Plaintiffs and the Class's standard form mortgage agreement.  Either of these clauses typically protect the lender for a period of at least ten days after the termination of the homeowner's voluntary insurance policy.  Force-placed policies, however, take effect on the date of termination, and "double-cover" the property unnecessarily during the period covered by the LLPE or Standard Mortgage Clause.  This means the borrower is charged for coverage for which the lender or servicer has no exposure.

55.    The amounts charged borrowers are also inflated by the interest that accrues on the amounts owed for force-placed coverage; when Select Portfolio adds the cost of the high-priced premium to a homeowner's mortgage balance, it thereby increases the interest paid over the life of the loan by the homeowner to the lender

56.    The Defendants never disclose to Plaintiffs or other borrowers – through the notices or by any other means – the amounts of the "commissions" or reinsurance charges, or that Select Portfolio pays less for coverage than the amount that it charges the borrower.  Nor do Defendants disclose their exclusive relationship, or that Select Portfolio is charging the borrower for the below-cost services and the other improper kickbacks described above.

57.     Under this highly profitable force-placed insurance scheme, Select Portfolio is incentivized to purchase and force place high-cost insurance policies on a borrowers' properties because the higher the cost of the insurance policy, the higher the kickback.

58.     Select Portfolio also enters into an arrangement with the Assurant Defendants that provides it or its affiliates with "qualified expense reimbursement" payments.  These "expense reimbursements" were not legitimate reimbursements for actual costs and were simply another form of a bribe to Select Portfolio for the exclusive arrangement to force-place insurance.  Neither Select Portfolio nor its affiliates performed any bona fide services or incurred any costs for the payments that they received and these payments were never disclosed to borrowers.

59.     The actions and practices described above are unconscionable and undertaken in bad faith with the sole objective to maximize profits.  Borrowers who for whatever reason have stopped paying for insurance or are under-insured on mortgaged property are charged hyper-inflated, illegitimate, and noncompetitive amounts for force-placed insurance.  These charges are inflated to include undisclosed kickbacks to Defendants or their affiliates (who, as described above, perform little to no functions related to the force-placement of the individual policies), as well as the cost of discounted administrative services and other costs described above.

60.     Borrowers have no say in the selection of the force-placed insurance carrier or the terms of the force-placed insurance policies and have no ability to seek out and purchase a force-placed insurance policy.  Force-placed policies are commercial insurance policies intended to be sold to lenders and servicers and their terms are determined by the lender/servicer, here, Select Portfolio, and the insurer, here, ASIC and SGIC.

61.     Servicers, like Select Portfolio, are financially motivated to select the insurer, like ASIC and SGIC, that offers it the best financial benefit in the terms of "commissions,"

reinsurance, direct payments, discounted tracking services, or expense reimbursements. This action is brought to put an end to Defendants' exclusive, collusive, and uncompetitive arrangements, and to recover for Plaintiffs the excess amounts charged to them beyond the true cost of insurance coverage.

## **Plaintiff Juan Almanzar**

62.     Plaintiff Juan Almanzar took a mortgage loan from Accredited Home Lenders, Inc. in October 2006 secured by a mortgage on real property in North Bergen, New Jersey.    At all times relevant to the allegations herein, Plaintiff's mortgage loan was owned or serviced by Select Portfolio.

63.     Mr. Almanzar's mortgage agreement provides as follows:

**5. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained In the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance

357717                                             20

that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

…

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument**. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

64.     The mortgage agreement is attached hereto as **Exhibit A**.

65.     Mr. Almanzar had voluntary hazard insurance coverage with The Philadelphia Contributorship Insurance Company.  Mr. Almanzar's annual premium for his voluntary hazard insurance was $2,063 in 2006.

66.     Pursuant to the automated procedures in place and purporting to come from Select Portfolio (although it was actually sent by ASIC), Mr. Almanzar was sent a Notice of Intent to Place Insurance by letter dated August 30, 2012.  It notified him that because Select Portfolio had not received proof of Mr. Almanzar's homeowner's insurance coverage, it was purchasing insurance for his property. The letter included a temporary 56 day insurance binder from ASIC for retroactive coverage that commenced July 16, 2012.  The annual premium for the force-placed policy was $5,133.79.

67.     The Defendants sent Mr. Almanzar a letter dated June 6, 2013, in which they notified him that the insurance they purchased for him in 2012 was due for renewal on July 16,

2013.  They further stated that if the force-placed policy renewed, the premium would be paid from his escrow account.

68.     The Defendants sent Mr. Almanzar a Notice of Placement of Insurance dated October 3, 2012.  The Notice of Placement included a force placed insurance policy from ASIC. The premium for the policy was $5,133.79.

69.     The Defendants sent Mr. Almanzar a letter dated May 26, 2014, in which it notified Mr. Almanzar that it was renewing the lender placed policy already in effect.  The premium for the new policy was expected to be $4, 210.

70.     Similar to all other Select Portfolio borrowers, at no time did any Defendant disclose, by any means, to Plaintiff that an exclusive relationship between Select Portfolio and the Assurant Defendants was already in place and "commission" paid to a Select Portfolio affiliate was not paid for any work but simply a bribe to keep that exclusive force-placed relationship in place.

71.     It was also never disclosed to Plaintiff or the class that because of this kickback, Select Portfolio itself would effectively be paying a reduced amount of the amount it charged to Plaintiff for the force-placed insurance coverage.  Finally, it was never disclosed to Plaintiff or the class that the amounts charged to them covered other illegitimate kickbacks, including reinsurance, and below cost mortgage services not properly charged to them.

72.     There are no material differences between these Defendants' actions and practices directed to Mr. Almanzar and their actions and practices directed to the Class.

**Plaintiff Jocelyn Evans**

73.     Plaintiff Jocelyn Evans took a mortgage loan from Fremont Investment & Loan in June 2006 secured by a mortgage on real property in Lucas, Texas.    At all times relevant to the

allegations herein, Plaintiff's mortgage loan was owned or serviced by Select Portfolio.

74.    Ms. Evans mortgage agreement provides as follows:

**5. Property Insurance**.  Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained In the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification.  Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

…

9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument. If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is

reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property.

75.     Ms. Evans' mortgage is attached as **Exhibit B**.

76.     The voluntary insurance on Plaintiff Evans' home eventually lapsed.

77.     At some point after Select Portfolio took over Ms. Evans' loan, it began force-placing insurance on Ms. Evan's home through SGIC.

78.     For example, Select Portfolio, force-placed a hazard insurance policy through SGIC on Ms. Evans' home for the annual period of June 2013 to June 2014 and charged her the amount of $6,028.88 for the force-placed policy.

79.     In an August 19, 2013 letter to Ms. Evans, pursuant to the automated procedures in place and purportedly coming from Select Portfolio, SGIC informed her that the "premium" of the force-placed policy would be charged to her escrow account.

80.     Similar to all other Select Portfolio borrowers, at no time did any Defendant disclose, by any means, to Plaintiff that an exclusive relationship between Select Portfolio and the Assurant Defendants was already in place and the "commission" paid to a Select Portfolio affiliate was not paid for any work but simply a bribe to keep that exclusive force-placed relationship in place.

81.     It was also never disclosed to Plaintiff or the class that because of this kickback, Select Portfolio itself would effectively be paying a reduced amount of the amount it charged to Plaintiff for the force-placed insurance coverage.  Finally, it was never disclosed to Plaintiff or the class that the amounts charged to them covered other illegitimate kickbacks, including reinsurance, and below cost mortgage services not properly charged to them

82.     Upon information and belief,  Select Portfolio continues to charge Ms. Evans for

these force-placed policies

83.   There are no material differences between these Defendants' actions and practices

directed to Ms. Evans and their actions and practices directed to the Class

**CLASS ALLEGATIONS**

**A.**   **Class Definitions**

84.   Plaintiffs bring this action against Defendants pursuant to Rule 23 of the Federal

Rules of Civil Procedure on behalf of themselves and all other persons similarly situated.

Plaintiffs seek to represent the following classes:

**Nationwide class:**

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property through Select Portfolio or its companies' affiliates, entities, or subsidiaries.  Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees

**New Jersey Subclass as to Counts V and VI – New Jersey Consumer Fraud Act:**

> All borrowers who, within the applicable statutes of limitation, were charged for a force-placed hazard insurance policy placed on property located within the State  of New Jersey, through Select Portfolio Defendants and/or these companies' affiliates, entities, or subsidiaries. Excluded from this class are Defendants, their affiliates, subsidiaries, agents, board members, directors, officers, and/or employees.

85.   Plaintiffs reserve the right to modify or amend the definitions of the proposed

classes before the Court determines whether certification is appropriate.

86.   Defendants subjected Plaintiffs and the respective Class members to the same

unfair, unlawful, and deceptive practices and harmed them in the same manner.

### B.    Numerosity

87.    The proposed classes are so numerous that joinder of all members would be impracticable.  Defendants sell and service millions of mortgage loans and insurance policies in the state of Florida, Texas, and New Jersey as well as nationwide.  The individual class members are ascertainable, as the names and addresses of all class members can be identified in the business records maintained by Defendants.  The precise number of class members for each class numbers at least in the thousands and can only be obtained through discovery, but the numbers are clearly more than can be consolidated in one complaint such that it would be impractical for each member to bring suit individually.  Plaintiffs do not anticipate any difficulties in the management of the action as a class action.

### C.    Commonality

88.    There are questions of law and fact that are common to Plaintiffs' and class members' claims.  These common questions predominate over any questions that go particularly to any individual member of the Class.  Among such common questions of law and fact are the following:

   a.  Whether Defendants charged borrowers for unnecessary insurance coverage including, but not limited to, insurance coverage that exceeded the amount required by law or the borrowers' mortgages and/or backdated coverage that covered periods of time for which Defendants had no risk of loss;

   b.  Whether Select Portfolio breached the mortgage contracts with Plaintiffs and the Class by charging them for force-placed insurance that included illegal kickbacks (including unwarranted commissions and other payments) and by charging Plaintiffs and the Class for servicing their loans;

   c.  Whether Defendants have been unjustly enriched at the expense of the Plaintiffs and the Class;

   d.  Whether Select Portfolio breached the implied covenant of good faith and fair dealing by entering into exclusive arrangements with ASIC and SGIC, which resulted in inflated amounts for insurance being charged to Plaintiffs and the

Class;

e.  Whether Defendants manipulated forced-placed mortgage purchases in order to maximize their profits to the detriment of Plaintiffs and the Class;

f.  Whether Select Portfolio affiliates perform any work or services in exchange for the "commissions" or other funds they collect;

g.  Whether the charges to Plaintiffs and the Class are inflated to include various kickbacks and unwarranted "commissions;"

h.  Whether the charges to Plaintiffs and the Class are inflated to include charges for bundled administrative services that the vendors provide to the lenders or mortgage servicers, and which are not chargeable to Plaintiffs and the Class under the terms of their mortgages;

i.  Whether the charges are inflated to include the cost of a riskless captive reinsurance arrangement

j.  Whether the Select Portfolio violated the federal Truth in Lending Act ("TILA") by conditioning their extensions of credit on the purchase of insurance through an affiliate, in direct contravention of the anti-coercion disclosures included in borrowers' mortgages;

k.  Whether the Select Portfolio violated TILA by failing to disclose kickbacks charged to class members in their mortgages;

l.  Whether Defendants actions and failure to disclose the real reasons for the high priced force placed policy premiums were likely to deceive the consuming public in violation of the NJCFA

m.  Whether  ASIC and SGIC intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts by paying kickbacks to the lenders/mortgage servicers or their affiliates and by charging for administering the loan portfolio;

n.  Whether Defendants were associated with the enterprise and agreed and conspired to violate the Federal RICO statutes;

o.  Whether Defendants' practices constitute mail fraud; and

p.  Whether Plaintiffs and the Class Members are entitled to damages and/or injunctive relief as a result of Defendants' conduct.

D.      **Typicality**

89.     Plaintiffs are members of the Class they seek to represent.  Plaintiffs' claims are typical of the respective classes' claims because of the similarity, uniformity, and common purpose of the Defendants' unlawful conduct.  Each class member has sustained, and will continue to sustain, damages in the same manner as Plaintiffs as a result of Defendants' wrongful conduct.

E.      **Adequacy of Representation**

90.     Plaintiffs are adequate representatives of the class they seek to represent and will fairly and adequately protect the interests of that class.  Plaintiffs are committed to the vigorous prosecution of this action and have retained competent counsel, experienced in litigation of this nature, to represent them.  There is no hostility between Plaintiffs and the unnamed class members.  Plaintiffs anticipate no difficulty in the management of this litigation as a class action.

91.     To prosecute this case, Plaintiffs have chosen the undersigned law firms, which are very experienced in class action litigation and have the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

F.      **Requirements of Fed. R. Civ. P. 23(b)(3)**

92.     The questions of law or fact common to Plaintiffs' and each Class member's claims predominate over any questions of law or fact affecting only individual members of the class.  All claims by Plaintiffs and the unnamed class members are based on the force-placed insurance policies that Defendants unlawfully secured and their deceptive and egregious actions involved in securing the force-placed policy.

93.     Common issues predominate when, as here, liability can be determined on a class-wide basis, even when there will be some individualized damages determinations.

94.     As a result, when determining whether common questions predominate, courts focus on the liability issue, and if the liability issue is common to the class as is the case at bar, common questions will be held to predominate over individual questions.

**G.      Superiority**

95.     A class action is superior to individual actions in part because of the non-exhaustive factors listed below:

>   (a) Joinder of all class members would create extreme hardship and inconvenience for the affected customers as they reside all across the states;

>   (b) Individual claims by class members are impractical because the costs to pursue individual claims exceed the value of what any one class member has at stake.  As a result, individual class members have no interest in prosecuting and controlling separate actions;

>   (c) There are no known individual class members who are interested in individually controlling the prosecution of separate actions;

>   (d) The interests of justice will be well served by resolving the common disputes of potential class members in one forum;

>   (e) Individual suits would not be cost effective or economically maintainable as individual actions; and

>   (f) The action is manageable as a class action.

**H.      Requirements of Fed. R. Civ. P. 23(b)(1) & (2)**

96.     Prosecuting separate actions by or against individual class members would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class.

97.     Defendants have acted or failed to act in a manner generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the Class as a whole.

## COUNT I

## BREACH OF CONTRACT
### (Plaintiffs against Select Portfolio)

98.　　Plaintiffs incorporate paragraphs 1-97 as if fully set forth in Count I.

99.　　Plaintiffs and all similarly situated class members have mortgages that are owned and/or serviced by Select Portfolio.

100.　　Plaintiffs and these class members' mortgages are written on uniform mortgage forms and contain substantially similar provisions regarding force-placed insurance and its placement by Select Portfolio.  The force-placed insurance provisions from Plaintiffs' mortgages are set forth above in paragraphs 63 and 74.

101.　　Paragraph 5 of Plaintiffs' mortgage contracts requires that they maintain insurance on the property and provides that if they fail to do so, then the lender or servicer may obtain insurance coverage to protect its interest in the property, "force place" the coverage, and charge the borrower.  Paragraph 9 of Plaintiffs' mortgage further provides that the "Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property."

102.　　Select Portfolio charges borrowers amounts for force-placed insurance that include unearned "commissions," reinsurance, and other kickbacks, as well as bundled administrative and other impermissible costs.  These costs are not costs of coverage, and are not applied to protecting Select Portfolio's rights or risk in the collateral for borrowers' mortgage loans. They are simply bribes to keep the Defendants' exclusive relationship in place.

103.　　Through the kickbacks it receives, Select Portfolio effectively pays a much lower amount for force-placed coverage than it charges to Plaintiff and other Class members.

357717

30

104.    Select Portfolio breached the mortgage agreements by, among other things, charging Plaintiffs and absent class members the amounts beyond the actual cost of coverage.

105.    Select Portfolio also breached Plaintiffs' and class members' mortgage agreements by charging Plaintiffs and the Class for duplicative insurance for the time period in which Select Portfolio is already covered by the Lenders Loss Payable Endorsement of the Standard Mortgage Clause as such coverage does not protect the Select Portfolio' rights in their collateral or cover their risk.

106.    Plaintiffs and the Class members have suffered damages as a result of Select Portfolio's breaches of contract.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, seek compensatory damages resulting from Select Portfolio's breaches of contract, as well as injunctive relief preventing them from further violating the terms of the mortgages. Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

## COUNT II

## BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING
### (Plaintiffs against Select Portfolio)

107.    Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count II.

108.    A covenant of good faith and fair dealing is implied in every contract and imposes upon each party a duty of good faith and fair dealing in its performance.  Common law calls for substantial compliance with the spirit, not just the letter, of a contract in its performance.

109.    Where an agreement affords one party the power to make a discretionary decision without defined standards, the duty to act in good faith limits that party's ability to act capriciously to contravene the reasonable contractual expectations of the other party.

110.    Plaintiffs' and the Class members' mortgage contracts allow Select Portfolio to force place insurance coverage on the borrower in the event of a lapse in coverage, but do not define standards for selecting an insurer or procuring an insurance policy.

111.    Select Portfolio is afforded substantial discretion in force-placing insurance coverage.  It is permitted to unilaterally choose the company from which it purchases force-placed insurance and negotiate any price for the coverage it procures.  Select Portfolio has an obligation to exercise the discretion afforded it in good faith, and not capriciously or in bad faith. Plaintiffs do not seek to vary the express terms of the mortgage contract, but only to insure that the Defendants exercise their discretion in good faith.

112.    Select Portfolio breached the implied covenant of good faith and fair dealing by, among other things:

> (a)   Manipulating the force-placed insurance market by selecting insurers (here, ASIC and SGIC) that sell high-priced insurance that includes kickbacks to Select Portfolio or its affiliates and issue excess insurance coverage not necessary to cover Select Portfolio's risk, and by failing to seek competitive bids on the open market and instead contracting to create "back room" deals whereby insurance coverage is routinely purchased from ASIC and SGIC without seeking a competitive price;

> (b)   Exercising their discretion to choose an insurance policy in bad faith and in contravention of the parties' reasonable expectations, by purposefully selecting force-placed insurance policies with artificially inflated premiums to maximize their own profits;

> (c)   Assessing inflated and unnecessary charges for force-placed insurance against Plaintiffs and the Class and misrepresenting the reason for the cost of the policies;

> (d)   Allowing Select Portfolio and its affiliates to collect a percentage of the charges to Plaintiffs and the Class as a kickback and not passing that percentage on to the borrower, thereby creating the incentive to seek the highest-priced force-placed insurance possible;

> (e)   Charging Plaintiffs and the Class for commissions when the insurance is prearranged and no commission is due;

(f)  Charging Plaintiffs and the Class the cost of having the vendor perform its obligation of administering its mortgage portfolio, which is not properly chargeable to Plaintiffs or the Class and where Select Portfolio is already paid for these expenses by the owners of the loans;

(g)  Force placing insurance coverage in excess of what is required by law or borrowers' mortgage agreements;

(h)  Force placing insurance coverage in excess of that required to cover the lender's interest in the property, or the balance owed on the loan;

(i) Charging Plaintiffs and the Class for "expense reimbursements" when no expenses are incurred by Select Portfolio in the force-placement of a borrower's insurance; and

(j) Charging Plaintiffs and the Class an inflated amount for the force-placed insurance premium due to the captive reinsurance arrangement

113.    As a direct, proximate, and legal result of the aforementioned breaches of the covenant of good faith and fair dealing, Plaintiffs and the Class have suffered damages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and similarly situated Class members, seek a judicial declaration that the Select Portfolio's conduct described above and the amounts charged to borrowers are in contravention of its duties of good faith and fair dealing. Plaintiffs also seek compensatory damages resulting from Select Portfolio's breaches of their duties.  Plaintiffs further seek all relief deemed appropriate by this Court, including attorneys' fees and costs.

<u>**COUNT III**</u>

<u>**UNJUST ENRICHMENT**</u>
<u>**(against Select Portfolio)**</u>[10]

114.    Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count III.

115.    Select Portfolio and its affiliates received from Plaintiffs and Class members,

---

[10] Plaintiffs plead their unjust enrichment claim against Select Portfolio in the alternative to their contractual claims against it.

benefits in the form of inflated amounts charged to borrowers for insurance related to force-placed insurance policies, unwarranted kickbacks in the form of "commissions," expense reimbursements, debt forgiveness, meaningless "licensing agreements," and subsidized loan servicing costs.

116.    These Defendants entered into an agreement whereby ASIC and SGIC would provide force-placed insurance coverage to Select Portfolio for the portfolio of loans monitored on its behalf.  Select Portfolio would then charge Plaintiffs and the Class amounts that had been artificially inflated to include costs not properly chargeable to the borrower.  The force-placed coverage imposed on borrowers was therefore far more expensive than those available to borrowers in the open market that provide even more coverage.

117.    These Defendants also collected amounts for force-placed insurance that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

118.    ASIC and SGIC paid significant amounts in kickbacks, tied directly to the cost of the force-placed insurance coverage.  Commissions or kickbacks were paid directly to Select Portfolio and/or its affiliates in order to be able to exclusively provide force-placed insurance policies.  ASIC and SGIC were mere conduits for the delivery of the kickbacks, "commissions," and other charges to Select Portfolio and/or their affiliates.

119.    These payments directly benefitted Select Portfolio and its affiliates and were taken to the detriment of the borrower.  The kickbacks, commissions, expense reimbursements, debt forgiveness, reinsurance payments, and subsidized costs were subsumed into the price of the force-placed insurance and ultimately paid by the borrower.  Therefore, these Defendants had the incentive to charge and collect unreasonably inflated prices for the force-placed coverage.

120.     Further, Select Portfolio received financial benefits in the form of increased interest income and duplicative insurance based upon the Lender Loss Payable Endorsement or the Standard Mortgage Clause.

121.     As a result, Plaintiffs and the Class have conferred a benefit on Select Portfolio.

122.     Select Portfolio had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it. Plaintiffs and the Class expected remuneration or would have expected remuneration had they known the true facts surrounding Select Portfolio's conduct. For example, had Plaintiffs and the Class known that the amounts Select Portfolio charged them included the costs of the kickbacks and other improper charges, they would have expected to be charged and/or paid less.  They would have expected not to be charged and/or paid for kickbacks and other improper charges.

123.     Select Portfolio will be unjustly enriched if it is allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which these Defendants were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against Select Portfolio in the amounts by which it has been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this Court deems just and proper.

## COUNT IV

### UNJUST ENRICHMENT
### (against ASIC and SGIC)

124.     Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count IV.

125.     Plaintiffs and the Class directly conferred benefits on ASIC and SGIC. Specifically, ASIC and SGIC received benefits in the form of funds for force-placed insurance

from Plaintiffs and the class members.

126.    Neither Plaintiffs nor the class members have ever entered into any written contracts with the ASIC, SGIC, or their affiliates.

127.    Select Portfolio contracted with the ASIC and SGIC to procure a master insurance policy which covers Select Portfolio's entire portfolio of mortgage loans.  Neither Plaintiff is party to this agreement.

128.    Moreover, this agreement does not govern the subject matter of this lawsuit.   The agreement does not, for example, authorize the payment of kickbacks.

129.    The Assurant Defendants received below-cost payments from Select Portfolio for providing tracking services but included the entire cost of that tracking service in the amounts for force-placed insurance that Select Portfolio ultimately charged to its borrowers.  ASIC and SGIC knew that the amounts for the force-placed insurance would be ultimately charged to the borrower and passed through to them but did not reduce the charges by the amounts paid to them from the Select Portfolio for the tracking services.

130.    ASIC and SGIC paid and collected significant monies to Select Portfolio in kickbacks tied directly to the cost of the force-placed insurance (as a percentage).  Bribes, and kickbacks were paid directly to Select Portfolio in order to be able to exclusively provide force-placed insurance coverage and receive the corresponding inflated amounts for the force-placed insurance.

131.    Select Portfolio also collected charges for force-placed policies that provided coverage in excess of that required by law or the borrowers' mortgage agreement, and in excess of that required to protect the lender's interest in its collateral.

132.    Upon information and belief, ASIC and SGIC accessed Select Portfolio's

databases and directly withdrew money from the Plaintiffs' escrow accounts to collect the charges for force-placed insurance including the illegal bribes and kickbacks. In other cases, Select Portfolio was a mere conduit for the delivery of insurance charges to ASIC and SGIC which included the illegal bribes and kickbacks.

133. As a result, Plaintiffs and the Class have conferred a direct benefit on the Assurant Defendants. In many cases, the benefit to ASIC and SGIC included direct withdrawals of the inflated amounts from Plaintiffs' accounts and in all cases, ASIC and SGIC benefited from the illegal force-placed insurance charges and not via some other service that they were providing for the Select Portfolio.

134. Plaintiffs and the Class expected remuneration or would have expected remuneration had they known the true facts surrounding ASIC's and SGIC's conduct. For example, had Plaintiffs and the Class known that the amounts that Select Portfolio charged them for insurance also included the costs of the kickbacks and other improper charges, they would have expected to be charged and/or paid less. They would have expected not to be charged and/or paid for kickbacks and other improper charges.

135. The Assurant Defendants had knowledge of this benefit and voluntarily accepted and retained the benefit conferred on it.

136. ASIC and SGIC will be unjustly enriched if they are allowed to retain the aforementioned benefits, and each class member is entitled to recover the amount by which they were unjustly enriched at his or her expense.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated Class members, demand an award against ASIC and SGIC in the amounts by which they have been unjustly enriched at Plaintiffs' and the Class members' expense, and such other relief as this

Court deems just and proper.

## COUNT V

## VIOLATION OF THE NJCFA
## (Plaintiff Almanzar against Select Portfolio)

137.    Plaintiff incorporates paragraphs 1- 97 herein as if fully set forth in Count V.

138.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise and misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby." N.J.S.A 56:8-2.

139.    Select Portfolio has engaged in, and continues to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  Select Portfolio had an exclusive relationship with its vendor and preferred insurance carrier, whereby it would pay unreasonable and inflated amounts for force-placed insurance, charge that amount to Plaintiff Almanzar and the New Jersey Subclass, and then receive compensation through various kickback arrangements – often based on a percentage of the cost of the force-placed insurance.

140.    Defendants made numerous misrepresentations and deceptive statements in carrying out their scheme to defraud Plaintiff Almanzar and the New Jersey Subclass.  The Assurant Defendants, with the approval of Select Portfolio, sent form letters to Plaintiff on Select Portfolio letterhead, stating that Select Portfolio would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.   Defendants represented in the letters that the costs of the insurance may be much higher than the cost of coverage the borrower could obtain on their own.

357717

141.    In making this statement, Defendants deceived and misrepresented to Plaintiff Almanzar and the New Jersey Subclass that the amounts Defendants charged Plaintiff for force-placed insurance represented the "cost" of the coverage.   In fact, such amounts were extraordinarily high because they also included kickbacks, reinsurance profits, and other wrongful benefits Select Portfolio received from the Assurant Defendants.   Letters containing these misrepresentations, deceptive statements and false pretenses were sent to Plaintiff Almanzar on October 3, 2012, June 6, 2013 and May 26, 2014.

142.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction.  N.J.S.A. 56:9-19.

143.    Plaintiff Almanzar and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

144.    Plaintiff Almanzar and the New Jersey Subclass have suffered an ascertainable loss of moneys or property as a direct and proximate result of Select Portfolio's unconscionable practices.  Select Portfolio had an exclusive relationship with the Assurant Defendants, whereby the Assurant Defendants would charge unreasonable and inflated premiums for force-placed insurance policies to Plaintiff Almanzar and the New Jersey Subclass.  As compensation, the Assurant Defendants would kick back a set percentage of the inflated premiums to Select Portfolio as a commission or enter into captive reinsurance agreements with Select Portfolio as a means to funnel financial benefits to them. Pursuant to the terms of the standard form mortgage agreements used by Select Portfolio, Select Portfolio would purchase the required hazard coverage and charge the Plaintiff and New Jersey Subclasses escrow accounts for the premiums.

Thus, as part of the scheme by Defendants, Select Portfolio charged Plaintiff and the New Jersey Subclass for the Assurant Defendants' inflated premiums caused by the kickbacks, reinsurance profits and other wrongful benefits they conveyed to Select Portfolio.

145.    Plaintiff Almanzar and the New Jersey Subclass have a private right of action against Select Portfolio that entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person interest, as well as an award for reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

146.    Plaintiff and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff Almanzar, on behalf of himself and the New Jersey Subclass, demands judgment against Select Portfolio for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

<u>**COUNT VI**</u>

<u>**VIOLATION OF THE NEW JERSEY CONSUMER FRAUD ACT**</u>
<u>**(Against Assurant Defendants)**</u>

147.    Plaintiff Almanzar re-alleges and incorporates paragraphs 1- 97 above as if fully set forth herein and further alleges as follows.

148.    The New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1, *et seq*., (the "NJCFA") prohibits the "use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation . . . in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such

person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby."  N.J.S.A 56:8-2.  "Sale" under the NJCFA includes any "sale . . . offer for sale . . . or attempt directly or indirectly to sell . . . or distribute."  N.J.S.A 56:8-1 (e).

149.    The Assurant Defendants have engaged in, and continue to engage in, unconscionable commercial practices, deceptive acts and misrepresentations in the conduct of their trade and/or commerce in the State of New Jersey.  The Assurant Defendants had a relationship with Select Portfolio, whereby they would charge unreasonable and inflated amounts for force-placed insurance to Plaintiff Almanzar and the New Jersey Subclass.  As compensation, the Assurant Defendants would kick back a set percentage of the inflated charges to Select Portfolio as a commission or enter into captive reinsurance agreements with Select Portfolio as a means to funnel financial benefits to them.

150.    Defendants made numerous misrepresentations in carrying out their scheme to defraud Plaintiff Almanzar and the New Jersey Subclass.  ASIC and SGIC, with the approval of Select Portfolio, sent form letters to  Plaintiff Almanzar and the New Jersey Subclass on  Select Portfolio letterhead, stating that  Select Portfolio would purchase or renew force-placed coverage if voluntary insurance was not secured.   Defendants represented in the letters that the costs of the insurance might be much higher than the cost of coverage the borrower could obtain on their own.   In making this statement, Defendants misrepresented to Plaintiff and the New Jersey Subclass that the amounts charged for force-placed insurance represented the "cost" of coverage. In fact, such amounts were extraordinarily high because they also included kickbacks, reinsurance profits, and other wrongful benefits the Assurant Defendants provided to Select Portfolio or its affiliates.  Letters containing these misrepresentations, deceptive statements and false pretenses were sent to Plaintiff Almanzar on October 3, 2012, June 6, 2013 and May 26,

2014.

151.    The NJCFA further provides that "[a]ny person who suffers an ascertainable loss of moneys or property, real or personal, as a result of the use or employment by another person any method, act, or practice declared unlawful under the [NJCFA] may bring an action or assert a counterclaim therefore in any court of competent jurisdiction."  N.J.S.A. 56:9-19.

152.    Plaintiff and the New Jersey Subclass are "person(s)" as that term is defined in N.J.S.A.56:8-1(d).

153.    Plaintiff and the New Jersey Subclass have suffered ascertainable losses of moneys or property as a direct and proximate result of the Assurant Defendant's unfair and unconscionable practices.  The standard form mortgage agreements used by Select Portfolio includes a provision requiring the Plaintiff Almanzar and the New Jersey Subclass to maintain hazard insurance coverage and in the event the coverage lapses, permits the lender to obtain force-placed coverage and charge the Plaintiff.  In the Defendants letters to Plaintiff and the New Jersey Subclass, Defendants state that   Select Portfolio would purchase the required hazard coverage and "[t]he premium for this policy/certificate will be added to the lien amount and the monthly mortgage payment will increase substantially."   Thus, as part of the scheme by Defendants, Plaintiff and the New Jersey Subclass were charged for the Assurant Defendants' inflated premiums caused by the kickbacks, reinsurance profits and other wrongful benefits they conveyed to Select Portfolio.

154.    Plaintiff Almanzar and the New Jersey Subclass have a private right of action against the Assurant Defendants that entitles them to recover, in addition to their actual damages, a threefold award of the damages sustained by any person interest, as well as an award reasonable attorney's fees, filing fees and reasonable costs of suit. N.J.S.A 56:8-19.

357717                                            42

155.     Plaintiff Almanzar and the New Jersey Subclass have suffered and will continue to suffer irreparable harm if these Defendants continue to engage in such deceptive, unfair, and unreasonable practices.

**WHEREFORE,** Plaintiff Juan Almanzar, on behalf of himself and the New Jersey Subclass, demands judgment against the Assurant Defendants for compensatory damages, pre- and post-judgment interest, treble damages, attorneys' fees, injunctive and declaratory relief, costs incurred in bringing this action, and any other relief as this Court deems just and proper.

## COUNT VII
## VIOLATIONS OF THE TILA, 15 U.S.C. § 1601, *et seq.*
## (against Select Portfolio)

156.     Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count VII.

157.     Plaintiffs' and the Class members' mortgages were consumer credit plans secured by their principal dwellings, and were subject to the disclosure requirements of TILA, 15 U.S.C. § 1601, *et seq.*, and all related regulations, commentary, and interpretive guidance promulgated by the Federal Reserve Board.

158.     Select Portfolio is a "creditor" as defined by TILA because it owned Plaintiffs' mortgage and changed the terms of the mortgage so as to create a new mortgage obligation, of which Select Portfolio was the creditor.

159.     Pursuant to TILA, Select Portfolio was required to accurately and fully disclose the terms of the legal obligations between the parties. *See* 12 C.F.R. § 226.17(c).

160.     Select Portfolio violated TILA, specifically 12 C.F.R. § 226.17(c), when it: (i) added force-placed insurance to Plaintiffs' mortgage obligations and failed to provide new disclosures; and (ii) failed at all times to disclose the amount and nature of the kickback, discount loan monitoring, and/or other profiteering involving Select Portfolio and/or its affiliates

as a result of the purchase of force-placed insurance.

161.    When Select Portfolio changed the terms of Plaintiffs' mortgage to allow previously unauthorized kickbacks and insurance amounts in excess of Select Portfolio's interests in the property, it changed the finance charge and the total amount of indebtedness, extended new and additional credit through force-placed insurance charges, and thus created a new debt obligation.  Under TILA, Select Portfolio was then required to provide a new set of disclosures showing the amount of the insurance premiums (*i.e.* finance charges) and all components thereof.  On information and belief, Select Portfolio increased the principal amount under Plaintiffs' mortgage when they force-placed the insurance, which was a new debt obligation for which new disclosures were required.

162.    Select Portfolio adversely changed the terms of Plaintiffs' loan after origination in order to allow their affiliate to receive a kickback on force-placed insurance premiums.  These kickbacks are not authorized in the mortgage in any clear and unambiguous way.  Select Portfolio has never disclosed to borrowers the amount of the "commissions" or other unearned profits paid to their affiliate.

163.    Select Portfolio also violated TILA by adversely changing the terms of Plaintiffs' loan after origination by requiring and threatening to force-place more insurance than necessary to protect their interest in the property securing the mortgages.

164.    Acts constituting violations of TILA occurred within one year prior to the filing of the original Complaint in this action, or are subject to equitable tolling because Select Portfolio's kickback and other unearned revenue-generating scheme was the subject of secret agreements among Select Portfolio and its affiliates and was concealed from borrowers.

165.    Plaintiffs and Class Members have been injured and have suffered a monetary

loss arising from Select Portfolio's violations of TILA.

166.     As a result of Select Portfolio's TILA violations, Plaintiffs and Class Members are entitled to recover actual damages and a penalty of $500,000.00 or 1% of these Defendants' net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2).

167.     Plaintiffs and Class Members are also entitled to recovery of attorneys' fees and costs to be paid by the Select Portfolio, as provided by 15 U.S.C. § 1640(a)(3).

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class members similarly situated, seek a judgment in their favor against Select Portfolio awarding actual damages and a penalty of $500,000.00 or 1% of the Select Portfolio's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), as well as of attorneys' fees and costs to be paid by the Select Portfolio, as provided by 15 U.S.C. § 1640(a)(3).

## COUNT VIII

## TORTIOUS INTERFERENCE WITH A BUSINESS RELATIONSHIP
### (against ASIC and SGIC)

168.     Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count VIII.

169.     Plaintiffs and the Class members have advantageous business and contractual relationships with Select Portfolio pursuant to their mortgage contracts.  Plaintiffs and the Class have legal rights under these mortgage contracts.  For example, Plaintiffs and the Class have a right not to be charged exorbitant amounts in bad faith for forced-place insurance.

170.     Plaintiffs allege that Select Portfolio breached their mortgage contracts with Plaintiffs and that ASIC and SGIC intentionally and unjustifiably caused the breach.

171.     The Assurant Defendants solicited Select Portfolio and proposed a fraudulent plan, whereby they would intentionally interfere with the existing relationship between Plaintiffs and Select Portfolio to obtain the exclusive rights to track and force place insurance upon Select

Portfolio's mortgage loan portfolio, and, upon information and belief, withdraw funds from the Plaintiffs' escrow accounts that include illegal kickbacks, such that ASIC, SGIC, and Select Portfolio have been able to reap millions of dollars in illegal profits.

172.    ASIC and SGIC have knowledge of the mortgage contracts and the advantageous business and contractual relationships between Plaintiffs and the Class and Select Portfolio. ASIC and SGIC are not a parties to the mortgage contracts, nor are they a third-party beneficiary of the mortgage contracts.  Further, ASIC and SGIC do not have any beneficial or economic interest in the mortgage contracts.

173.    The Assurant Defendants intentionally and unjustifiably interfered with Plaintiffs' and the Class's rights under the mortgage contracts, as described above, by, *inter alia*, entering into an exclusive relationship with Select Portfolio and its affiliates, whereby it provides bribes (kickbacks, debt forgiveness, low cost services…etc.) to Select Portfolio in exchange for the exclusive right to force-place high-priced and unnecessary amounts for force-placed insurance which are purposefully and knowingly charged to Plaintiffs and the Class.

174.    Plaintiffs and the Class have been directly damaged as a result of ASIC's interference with their mortgage contracts by being charged bad faith, exorbitant, and illegal charges and bribes for force-placed insurance, in contravention of their rights under the mortgages.

**WHEREFORE**, Plaintiffs, on behalf of themselves and all Class Members similarly situated, seek a judgment in their favor against ASIC and SGIC for the actual damages suffered by them as a result of their tortious interference.  Plaintiffs also seek all costs of litigating this action, including attorneys' fees.

## COUNT IX

### BREACH OF FIDUCIARY DUTY
### (against Select Portfolio)

175.     Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count IX.

176.     Select Portfolio holds funds in escrow on behalf of borrowers whose mortgages it services.  These funds are designated for the purpose of paying insurance premiums as they come due, and any excess funds are to be returned to Plaintiffs and members of the Class under the terms of the mortgage agreements.

177.     Select Portfolio has fiduciary relationships with Plaintiffs and the Class because it receives a greater economic benefit from these transactions than it would from a typical escrow transaction.   Specifically, the debtor-creditor relationship transformed into a fiduciary relationship when Select Portfolio exercised discretionary authority as an escrow agent by choosing among insurance providers and withdrawing money from borrowers' escrow accounts to pay charges imposed for force-placed insurance.  Select Portfolio violated its fiduciary duties when it engaged in self-dealing by arranging to receive the payment of unlawful kickbacks under the above-described kickback scheme.

178.     Select Portfolio breached its fiduciary duties to Plaintiffs and other members of the proposed class by: (1) not acting in borrowers' interest when it chose to purchase force-placed insurance from the ASIC and SGIC in return for kickbacks using escrow funds they held for the benefit of Plaintiffs and Class members at the expense of Plaintiffs and Class members; and (2) not disclosing the kickback scheme to Plaintiffs and Class Members.

179.     These actions were undertaken by Select Portfolio in bad faith for its own benefit and were not intended to benefit these Plaintiffs or other proposed Class members.

180.     As a direct result of Select Portfolio's actions and subversion of Plaintiffs' interest

357717

to its own in reaping extravagant and outrageous fees, Plaintiffs and all others similarly situated have suffered injury in the form of unnecessary and inflated escrow charges and a loss of funds from their escrow accounts.

WHEREFORE, Plaintiffs and the proposed class they seek to represent are entitled to damages for Select Portfolio's breaches of their fiduciary obligations and misappropriation of escrow funds.  In addition, Plaintiffs and the proposed class are entitled to punitive damages because Select Portfolio acted in bad faith in deliberate or reckless disregard of both their rights and Select Portfolio's obligation to hold their escrow funds in trust.

## COUNT X

### Violation of RICO, 18 U.S.C. § 1962(c)
### (Plaintiffs against All Defendants)

181.     Plaintiffs incorporate paragraphs 1- 97 herein as if fully set forth in Count X.

182.     At all relevant times, Defendants were employed by and associated with an illegal enterprise, and conducted and participated in that enterprise's affairs, through a pattern of racketeering activity consisting of numerous and repeated uses of the interstate mails and wire communications to execute a scheme to defraud, all in violation of RICO, 18 U.S.C. § 1962(c).

183.     The RICO enterprise which engaged in and the activities of which affected interstate and foreign commerce, was comprised of an association in fact of entities and individuals that included Select Portfolio, Assurant, Inc., SGIC, and ASIC and their affiliates.

184.     The members of the RICO enterprise had a common purpose: to increase and maximize their revenues by forcing Plaintiffs and Class members to pay inflated amounts for force-placed insurance through a scheme that inflated such amounts to cover kickbacks and expenses associated with monitoring Select Portfolio's entire loan portfolio, and concealing from Plaintiffs and Class members the true nature of those charges. Defendants shared the bounty of

their enterprise by sharing the illegal profits generated by the joint scheme.

185.  The RICO enterprise functioned over a period of years as a continuing unit and had a maintained an ascertainable structure separate and distinct from the pattern of racketeering activity.

186.  Select Portfolio, SGIC, and ASIC conducted and participated in the affairs of this RICO enterprise through a pattern of racketeering activity that projects into the future, lasted more than one year, and that consisted of numerous and repeated violations of federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign wire or mail facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

187.  Select Portfolio, SGIC, and ASIC directed and controlled the enterprise as follows:

- ASIC and SGIC specifically developed and implemented guidelines and standards for the timing and content of the cycle of deceptive letters sent to borrowers about force-placed insurance, to which Select Portfolio agreed;

- ASIC and SGIC drafted the language of the fraudulent letters and correspondence to borrowers that was specifically designed to deceive borrowers into believing that they were coming from Select Portfolio. The letters  fraudulently misrepresented the true "cost" of the insurance forced on their properties, and these letters were approved by Select Portfolio;

- ASIC and SGIC ran the day-to-day operations of the force-placed scheme by, *inter alia*, tracking Select Portfolio's portfolio, mailing a cycle of form letters to borrowers notifying them that insurance coverage would be forced, and misrepresenting to borrowers both that they would be charged only the costs of coverage and that a Select Portfolio affiliate would be paid a commission as compensation for work performed;

- ASIC and SGIC paid kickbacks to Select Portfolio and its affiliates to maintain Defendants' exclusive relationship and keep their force-placed scheme moving forward;

- by directing, controlling, and creating an enterprise and arrangement by which Select Portfolio would receive unearned kickbacks;

- by directing, controlling, and creating an enterprise and arrangement by which Select Portfolio would receive illegitimate revenues (ultimately

charged to borrowers) in the form of direct payments, reinsurance, expense reimbursements, or credits that were merely bribes to keep the exclusive relationship and not disclosing same to borrowers;

- by directing, controlling, and creating an enterprise and program by which Select Portfolio never charged the borrowers its actual or effective cost to procure the lender placed policies;

- by directing, controlling, and creating an enterprise and program where ASIC and SGIC took money directly from borrowers escrow accounts and took amounts which are not the actual or effective "cost" for lender placed insurance but instead, including illegal bribes and kickbacks;

- by designing and directing an exclusive arrangement by which Defendants manipulated the force-placed insurance market in order to artificially inflate the amounts they charge to borrowers for force-placed insurance. The charges were inflated to provide Select Portfolio and its affiliates with kickbacks disguised as "commissions" or expense reimbursements, or to cover the cost of discounted services, and/or to provide Select Portfolio with lucrative debt forgiveness or reinsurance payments. ASIC and SGIC benefit by securing business from Select Portfolio—they provide kickbacks to Select Portfolio at the expense of the borrowers who are charged the inflated charges;

- by developing and implementing guidelines and criteria to determine when force-placed insurance is placed an a borrower's home, in what amount, for what coverages and for what period of time—all of which resulted in inferior and more expensive insurance that covered time periods where no claims were made and/or resulted in "double coverage;" and

- by developing and implementing an automated system to send the cycle of deceptive letters to borrowers, to determine the type, time period and amount of substandard and unnecessary coverage, and to remove or charge borrowers' escrow accounts automatically for improper and inflated charges.

188.    In order to further their control and direction of the enterprise, ASIC and SGIC paid bribes and kickbacks to Select Portfolio in the form of unearned commissions, direct payments, expense reimbursements, reinsurance payments, and below cost services.

189.    As part of and in furtherance of the scheme to defraud, Defendants made numerous material omissions and misrepresentations to Plaintiffs and Class members with the

intent to defraud and deceive Plaintiffs and Class members.

190.    For example, ASIC and SGIC, with the approval of Select Portfolio, sent form letters to Plaintiffs on Select Portfolio letterhead through the U.S. Mail, stating that Select Portfolio would purchase or renew force-placed coverage if voluntary insurance was not secured by a certain date.   These Defendants represented in the letters that Select Portfolio would "obtain" the required coverage and charge the borrower "the premium amount" or "the cost of the insurance."   In making these statements, Defendants knowingly and intentionally falsely stated that the amounts for force-placed insurance that Plaintiffs were charged represented the actual "cost" of the policies, when in fact such amounts also included kickbacks and other costs paid as bribes to Select Portfolio.

191.    Defendants also knowingly and intentionally fostered the mistaken impression that Select Portfolio was actively "obtaining" a policy for the borrower when in fact no work was done and no expenses were incurred by Select Portfolio or its affiliates because a master policy was already in place and the force-placed insurance was issued pursuant to the Assurant Defendants' automated procedures in place.

192.    Defendants had a duty to correct these statements and mistaken impressions. These misrepresentations and omissions were material, as they helped Defendants advance their scheme to charge Plaintiffs unreasonably high amounts for force-placed insurance and were designed to lull Plaintiffs and the class into believing that the charges were legitimate.

193.    Plaintiffs and other homeowners would not have paid, or would have contested these specific charges had Defendants disclosed that the illegal bribes and kickbacks were included and that these forced-charges did not represent simply the "cost" of the required

insurance coverage.[11]   Letters such as these were sent to Plaintiff Almanzar on October 3, 2012, June 6, 2013 and May 26, 2014.  Letters such as these were also sent to Plaintiff Evans on August 19, 2013 and June 16, 2014.

194.   ASIC and SGIC with the approval of Select Portfolio and on Select Portfolio letterhead, also sent Plaintiffs and the Class members force-placed insurance notices informing them that force-placed insurance had been purchased.   The letters represented that "[t]he premium for this policy/certificate will be added to your lien amount and the monthly mortgage payment will increase substantially" or that "[t]he premium for this policy/certificate will be charged to your escrow account."   Thus, Defendants knowingly and intentionally fostered the mistaken impression that the amounts for force-placed insurance premiums that Plaintiffs were charged represented the true cost of the force-placed coverage.   In fact, the amounts charged to Plaintiffs were less than what Select Portfolio actually pays for the insurance coverage because they included kickbacks, reinsurance profits, direct payments, "expense reimbursements," below-cost administrative services and other compensation returned to Select Portfolio but not passed on to Plaintiffs or the borrowers.   Letters including this misrepresentation were sent to Plaintiff Almanzar on October 3, 2012 and May 26, 2014 and to Plaintiff Evans on August 19, 2013 and June 16, 2014.

195.   The omission was material, as it gave Defendants a colorable reason to charge Plaintiffs unreasonably inflated amounts for insurance and would have influenced Plaintiffs' decisions whether to pay the charges or contest them.  Plaintiffs would not have paid or would

---

11 "A plaintiff asserting a RICO claim predicated on mail fraud need not show, either as an element of its claim or as a prerequisite to establishing proximate causation that it relied on defendant's alleged misrepresentations."  *See Bridge v. Phoenix Bond & Indemnity Co.*, 553 U.S. 639, 661 (2008).  The focus is whether Plaintiff can show that the Defendants used the mails to further the scheme to defraud and that their injury was proximately caused by the alleged scheme.  *Wallace*, 714 F.3d 414 (6th Cir. 2013).

have contested the charges for force-placed insurance had they known that the amounts charged to them included the kickbacks.  One such letter was sent to Plaintiff Almanzar on June 6, 2013 and to Plaintiff Evans on August 19, 2013.

196.    For the purpose of executing the scheme to defraud, Defendants sent, mailed, and transmitted, or caused to be sent, mailed, or transmitted, in interstate or foreign commerce numerous materials, including but not limited to the notices and letters described above informing Plaintiffs and Class members that they could charge Plaintiffs and Class members unreasonably high amounts for force-placed insurance. This scheme to defraud proximately injured Plaintiffs and the Class because it prevented them from making an informed decision regarding whether to dispute or pay the force-placed charges, or whether to allow new coverage to be placed on their property.  Had they known that the charges had been artificially inflated to include kickbacks and other improper charges, they would not have paid them or would have contested them.  Defendants also transferred sums among themselves, including but not limited to kickbacks, in furtherance of their scheme to defraud Plaintiffs and Class members, in violation of the wire fraud statutes.

197.    By reason and as a result of Defendants' conduct and participation in the racketeering activity alleged herein, Defendants have caused damages to Plaintiffs and Class members in the form of unreasonably high force-placed insurance premiums.

**WHEREFORE**, Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## COUNT XI

### Violation of RICO, 18 U.S.C. § 1962(d)
### (Plaintiffs against all Defendants)

198.    Plaintiffs incorporate paragraphs 1- 97 and 182 - 197 herein as if fully set forth in

Count XI.

199.    At all relevant times, Defendants were associated with the enterprise and agreed and conspired to violate 18 U.S.C. § 1962(d).  Defendants agreed to conduct and participate, directly and indirectly, in the conduct and affairs of the enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

200.    Select Portfolio, SGIC, and ASIC illegally agreed to violate RICO, 18 U.S.C. § 1962(d), by, *inter alia*:

- agreeing that ASIC and SGIC would be Select Portfolio's exclusive force-placed insurance providers and would extract unreasonably inflated amounts from Select Portfolio's customers.  Defendants also agreed that ASIC and SGIC would pay kickbacks to Select Portfolio and its affiliates;

- agreeing that ASIC and SGIC would monitor Select Portfolio's mortgage portfolios for lapses in voluntary insurance and would, with the approval of Select Portfolio, send misleading notices to borrowers.  These misleading notices would inform the borrowers that if new coverage were not procured, coverage would be forced, the borrower would be charged "the cost of the insurance" and earned "commissions" payments would be paid to a Select Portfolio affiliate;

- entering into illusory commission, reinsurance or outsourcing agreements in order to disguise the true nature of the amounts charged to borrower under the guise of force-placed insurance; and

- agreeing to commit two or more predicate acts as described above in Count X.

201.    Through "soft dollar" or other credits, Select Portfolio affiliates pass profits from this scheme to Select Portfolio.

202.    Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof, including but not limited to the acts set forth above.

203.    As a result of Defendants' violations of 18 U.S.C. § 1962(d), Plaintiffs and Class members suffered damages in the form of unreasonably high force-placed insurance premiums.

357717                                       54

**WHEREFORE,** Plaintiffs and Class members seek compensatory and treble damages, and attorneys' fees and costs, pursuant to 18 U.S.C. § 1964(c).

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, on behalf of themselves and all similarly situated individuals, demand judgment against Defendants as follows:

(1)     Declaring this action to be a proper class action maintainable pursuant to Rule 23(a) and Rule 23(b)(1) and (2), or Rule 23(b)(3) of the Federal Rules of Civil Procedure and declaring Plaintiffs and their counsel to be representatives of the Class and the Florida Subclass;

(2)     Enjoining Defendants from continuing the acts and practices described above;

(3)     Awarding damages sustained by Plaintiffs and the Class as a result of Select Portfolio's breaches of the subject mortgage contracts and the implied covenant of good faith and fair dealing, together with pre-judgment interest;

(4)     Finding that Defendants have been unjustly enriched and requiring Defendants to refund all unjust benefits to Plaintiffs and the Class, together with pre-judgment interest;

(5)     Awarding Plaintiffs and the Class costs and disbursements and reasonable allowances for the fees of Plaintiffs' and the Class's counsel and experts, and reimbursement of expenses;

(6)     Awarding Plaintiff Almanzar and the New Jersey Subclass actual and treble damages, injunctive relief, declaratory relief, pre- and post-judgment interest, attorneys' fees and costs under the NJCFA;

(7)     Awarding damages sustained by Plaintiffs and the Class as a result of the Assurant Defendants' tortious interference;

(8)     Awarding actual damages and a penalty of $500,000.00 or 1% of Select

357717

55

Portfolio's net worth, as provided by 15 U.S.C. § 1640(a)(1)-(2), and attorneys' fees and costs, as provided by 15 U.S.C. § 1640(a)(3);

(9)     Awarding compensatory and treble damages, and attorneys' fees and costs under the federal RICO statute; and

(10)     Awarding such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Respectfully submitted this 16th day of October, 2014.

By: */s/ Adam M. Moskowitz*

| | |
|---|---|
| Adam M. Moskowitz, Esq. <br> amm@kttlaw.com <br> Thomas A. Tucker Ronzetti, Esq. <br> tr@kttlaw.com <br> Rachel Sullivan, Esq. <br> rs@kttlaw.com <br> Robert J. Neary, Esq. <br> rn@kttlaw.com <br> **KOZYAK, TROPIN, &** <br> **THROCKMORTON LLP** <br> 2525 Ponce de Leon Blvd., 9th Floor <br> Coral Gables, FL 33134 <br> Tel:  (305) 372-1800 / Fax: (305) 372-3508 <br> *Counsel for Plaintiffs* | Aaron S. Podhurst, Esq. <br> apodhurst@podhurst.com <br> Peter Prieto, Esq. <br> pprieto@podhurst.com <br> John Gravante, III, Esq. <br> jgravante@podhurst.com <br> Matthew Weinshall <br> mweinshall@podhurst.com <br> **PODHURST ORSECK, P.A.** <br> City National Bank Building <br> 25 West Flagler Street, Suite 800 <br> Miami, Florida 33130 <br> Tel: 305-358-2800 / Fax: 305-358-2382 <br> *Counsel for Plaintiffs* |
| Lance A. Harke, Esq. <br> lharke@harkeclasby.com <br> Sarah Engel, Esq. <br> sengel@harkeclasby.com <br> Howard M. Bushman, Esq. <br> hbushman@harkeclasby.com <br> **HARKE CLASBY & BUSHMAN LLP** <br> 9699 NE Second Avenue <br> Miami Shores, Florida 33138 <br> Tel: (305) 536-8220 / Fax: (305) 536-8229 <br> *Counsel for Plaintiffs* | Chip Merlin, Esq. <br> cmerlin@merlinlawgroup.com <br> Philip Sanov, Esq. <br> psanov@merlinlawgroup.com <br> Shaun Marker, Esq. <br> smarker@merlinlawgroup.com <br> **MERLIN LAW GROUP, P.A.** <br> 777 S. Harbour Island Blvd., Suite 950 <br> Tampa, FL 33602 <br> Tel: 813-229-1000 / Fax: 813-229-3692 <br> *Counsel for Plaintiffs* |

357717

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on October 16, 2014, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

By:  /s/ Robert J. Neary