**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 1:14-cv-22586-FAM**

JUAN ALMANZAR and
JOCELYN EVANS on behalf of themselves
and all others similarly situated,

       Plaintiffs,

v.

SELECT PORTFOLIO SERVICING, INC.,
STANDARD GUARANTY INSURANCE
COMPANY, AMERICAN SECURITY
INSURANCE COMPANY, and VOYAGER
INDEMNITY INSURANCE COMPANY,

       Defendants.
_____/

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY**
**APPROVAL OF CLASS ACTION SETTLEMENT AND**
<u>**FOR CERTIFICATION OF THE SETTLEMENT CLASS**</u>

Plaintiffs are proud to announce another extraordinary settlement that would provide significant monetary relief to all mortgagors nationwide who had insurance coverage "force placed" on their properties by Select Portfolio Servicing, Inc. ("SPS"), as well as significant injunctive relief that would effectively end the lender-placed insurance ("LPI") practices at issue for SPS borrowers nationwide. This is the eleventh LPI class action settlement presented in this district, and ten of the eleven before it have already been granted preliminary approval.[1] Plaintiffs respectfully request that this Court do the same here.

Defendants will pay cash refunds or issue credits of 12.5%, 6.5%, or 5% of the total net annual premium to class members who paid the amounts charged them, depending on when coverage was placed and on which product LPI was based. This settlement follows substantially similar LPI settlements in which this Court has already granted preliminary approval, including those in *Wilson v. Everbank,* No. 14-22264 (S.D. Fla.); *Lee v. Ocwen Loan Servicing, LLC*, No. 14-cv-60649 (S.D. Fla.); *Braynen v. Nationstar Mortgage, Inc.*, No. 14-cv-20726 (S.D. Fla.); *Saccoccio v. JPMorgan Chase Bank, N.A.*, No. 13-cv-21107 (S.D. Fla.); *Fladell v. Wells Fargo Bank, N.A.*, No. 13-cv-60721 (S.D. Fla.); *Diaz v. HSBC Bank (USA), N.A.*, No. 13-cv-21104 (S.D. Fla.); *Hamilton v. SunTrust Mortgage, Inc.*, No. 13-cv-60749 (S.D. Fla.); *Hall v. Bank of America, N.A.*, No. 12-cv-22700 (S.D. Fla.); and *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.).

The settlement's proposed benefits are the result of hard-fought, arm's-length negotiations between the parties and their counsel under the direction of an experienced mediator, Jonathan Marks. Undersigned counsel were well-positioned to evaluate and negotiate this settlement

---

[1] The plaintiffs in *Montoya v. PNC Bank, N.A.*, No. 14-cv-20474 (S.D. Fla.), have already moved for preliminary approval, and their motion is pending before Magistrate Goodman, who is sitting by designation. Yesterday, Judge Goodman granted Final Approval to the lender placed settlement in *Lee v. Ocwen,* No. 14-cv-60649 (D.E. 184).

because they have been investigating mortgage lenders' LPI practices since November 2010, and their investigation and the litigation that followed involved a review of more than three million documents and dozens of depositions. Despite that work, Plaintiffs and the Settlement Class faced significant hurdles in litigating their claims to resolution. As such, and given the immediate and substantial benefits the settlement will provide, there is no question that the settlement falls within the range of reasonableness and warrants preliminary approval.

## FACTUAL BACKGROUND

1. **Defendants' LPI Practices**

The standard form mortgage agreements serviced by SPS require the borrower to maintain insurance on the property securing his or her mortgage loan, and provide that the lender or servicer may force new coverage on the property at the borrower's expense in the event of a lapse. (D.E. 36-1 ¶ 5.) The mortgage agreement authorizes the lender to obtain coverage to protect itself against risk of loss, and either advises the borrower that the cost of the coverage might significantly exceed that of the borrower's voluntary coverage or provides that the lender may pay costs necessary to protect its rights in the property. (*Id.*)

2. **The Litigation**

Plaintiffs Almanzar and Evans filed the original nationwide class action complaint on July 11, 2014, bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, tortious interference, breach of fiduciary duty, and violations of the New Jersey Consumer Fraud Act, the Truth in Lending Act, and the federal RICO statute. (D.E. 1.) Defendants moved to dismiss the complaint, but Plaintiffs amended their claims on October 16, 2014, before the Court entered an opinion on the motions to dismiss. (D.E. 36.) Defendants moved to dismiss the First Amended Complaint on November 3, 2014 (D.E. 37, 38, 39). On December 2, 2014, SPS also moved to transfer venue to the District of Utah. (D.E. 50.)

The Court denied transfer on January 29, 2015, (D.E. 60), and on March 24, 2015, after a hearing on the motions, the Court denied the motions to dismiss in their entirety (D.E. 70, 71, 72). Defendants then answered the First Amended Complaint. (D.E. 74, 75.)

The parties conducted substantial discovery, with Defendants producing more than ten thousand pages of documents, in addition to the more than two million pages of documents the Assurant Defendants had already produced to undersigned counsel in other LPI litigation. Each party took numerous depositions, including those of Defendants' representatives and Plaintiffs Almanzar and Evans. Substantial third-party discovery was also conducted by the Defendants. On May 7, 2014, the Court set this matter for trial in November 2015. (D.E. 78.)

On July 7, 2015, a formal mediation of this matter was held before mediator Jonathan Marks in Washington, D.C. In advance of and during the mediation, Defendants provided Plaintiffs and Class Counsel with additional information concerning their LPI program, including aggregate LPI premium information nationwide for all programs. The mediation involved an in-person session, numerous pre-mediation conference calls, and the exchange of extensive written information concerning the claims raised in litigation. It also included the collection, production, and review of large volumes of electronically stored data.

The Parties reached a settlement-in-principle at the formal session, and the Parties' counsel agreed on a settlement outline that identified the material terms of the settlement. On September 4, 2015, Plaintiffs amended the complaint to include claims against Defendant VIIC.

The Parties announced their settlement to the Court on July 27, 2015, and the Court then stayed litigation pending settlement approval. (D.E. 87, 88.) The parties documented their agreement in a memorandum of understanding, and subsequently finalized and executed a settlement agreement, a copy of which is attached as **Exhibit A**.[2]

---

[2] The following documents are attached to the Settlement Agreement as exhibits: Class Notice (Exhibit A); Claim Form Instructions (Exhibit B); Claim Form (Exhibit C); proposed Preliminary

### 3.     The Settlement Terms and Agreement

#### A. *The Proposed Settlement Class*

The Settlement Agreement provides relief to "all borrowers in the United States who … were charged by SPS under a hazard or wind-only LPI Policy for Residential Property," between July 11, 2010 and the preliminary approval date.   (Ex. A ¶¶ 3.1, 3.2).   This class will include borrowers whose homes are in foreclosure and short sale, and those granted a deed in lieu of foreclosure or loan modifications.[3]

#### B. *Monetary and Prospective Relief*

The Settlement Agreement affords members of the Settlement Class significant monetary and prospective relief.   (*Id.* ¶ 4.)   The monetary relief will compensate class members for a significant part of the inflated portion of the amounts that they either paid or were charged for force-placed coverage.   All Settlement Class members who paid any portion of the amounts owed for LPI and submit a valid claim form will recover 12.5%, 6.5% or 5%, depending on when coverage was forced and what LPI product was placed,[4] of the net premium *charged* to them during the class period, less any refund credited them.   (*Id.* ¶ 4.6.3.)   The payment is taken from the entire premium, rather than the "excess" or inflated portion of the premium, since a considerable portion of the premiums charged, in fact, was applied to pay for coverage.   Qualified members who paid

---

Approval Order (Exhibit D); proposed Final Approval Order (Exhibit E); and proposed Final Judgment (Exhibit E-1).

[3] By contrast, the court in *Williams v. Wells Fargo Bank, N.A.*, No. 11-cv-21233 (S.D. Fla.), specifically excluded certain categories that are included in this settlement from the Florida class it certified in February 2012. *See Williams*, (D.E. 211).

[4] Borrowers whose coverage was forced between July 11, 2010 and November 30, 2011, will receive a sum equal to 12.5% of the amounts charged them; borrowers whose coverage was forced on or after December 1, 2011 based on the Mortgage Service Program hazard LPI product provided by ASIC and/or SGIC will receive 6.5%; and borrowers whose coverage was forced on or after December 1, 2011 based on the Mortgage Interest Protection hazard LPI product provided by ASIC and/or SGIC will receive 5%.  (Ex. A ¶¶ 4.6.2, 4.6.3.)

any portion of their premiums will receive a check from SPS for the full settlement amount. (*Id.*). Settlement Class members who were charged but did not pay for LPI will receive a check or a credit to their SPS account in the amount of 12.5%, 6.5%, or 5% of the LPI policy's net premium, the distribution method being at SPS' discretion. (*Id.* ¶ 4.6.2.)

The injunctive relief provided by the Settlement Agreement will put an end to the LPI practices that are the subject of this lawsuit. The Settlement Agreement prohibits SPS and the Assurant Defendants from continuing to charge what Plaintiffs allege are inflated premiums for LPI. For a period of five years following the Final Settlement Date, SPS and its affiliated companies are prohibited from accepting all or a portion of any commissions paid in the placement of LPI. (*Id.* ¶ 4.2.1.), placing LPI through an SPS-affiliated insurer or vendor or entering into a reinsurance arrangement on the placement of LPI that do not meet the risk transfer standards of Accounting Standards Codification 944 (formerly FASB 113). (*Id.* ¶¶ 4.2.1., 4.2.2.) The Assurant Defendants will similarly be prohibited for five years from providing LPI commissions to SPS-affiliated agents or brokers, entering into prohibited types of quota-share reinsurance arrangements, and accepting from SPS payments for below-cost or free outsourced services. (*Id.* ¶ 4.3.)

The Settlement also requires SPS to establish LPI coverage at the last-known coverage amount or the unpaid principal balance on a borrower's loan, so that LPI coverage moving forward bears some relation to the value of the interest it protects. (*Id.* ¶ 4.2.1.) SPS will also advance funds in the event of a lapse to continue coverage under the borrower's voluntary policy, (*id.*), thus further ensuring that the cost of coverage bears some relation to the collateral's value and also reducing the number of LPI policies issued by the SPS and Assurant Defendants. Finally, the Settlement requires SPS to refund any amounts due to the borrower once voluntary insurance is put back in place within fifteen days of receipt of evidence of voluntary coverage. (*Id.*)

### C. *Release of Claims against Defendants*

In exchange for the relief provided by the Settlement, members of the Settlement Class will release SPS and the Assurant Defendants, as well as their all other entities included in the definition of "Released Persons" set forth in the Settlement Agreement (Ex. A ¶ 2.43), from all claims, actions, causes of action, suits, debts, sums of money, payments, obligations, reckonings, promises, damages, penalties, attorney's fees and costs, liens, judgments, and demands "that were or could have been sought or alleged in the *Almanzar* Litigation or that relate, concern, arise from, or pertain in any way" to the Released Persons' conduct, policies, or practices concerning SPS' placement, or the Assurant Defendants' issuance, of LPI Policies during the Settlement Class Period, including but not limited to conduct, policies or practices concerning LPI Policies or to charges for SPS' Placement of LPI Policies during the Settlement Class Period. (*Id.* ¶ 10.1.)

### D. *Class Notice and Claims Process*

Settlement Class members will receive notice of the settlement, instructions, and a claim form by first-class mail at their last-known mailing address in the forms attached to the Settlement Agreement as Exhibits A, B, and C, respectively, assuming they are approved by the Court. (*Id.* ¶ 6.1). Class members will receive both English- and Spanish-language versions of these documents. (*Id.*) The notice will be mailed no fewer than 90 days before the date set for the final approval hearing. (*Id.*). The Claims Administrator shall perform a search of the National Change of Address database for each mailing address attached to a notice that is returned as undeliverable. (*Id.*). The Settlement Administrator will also establish a website on which Settlement Class members may download and print or e-sign and upload a claim form and review the Settlement Agreement and its exhibits. (*Id.* ¶ 6.2.). The parties will also cause notice of the settlement to be published in *USA Today* and advertised on the internet. (*Id.* ¶¶ 6.3, 6.4.) The notice will provide

a toll-free number to call for settlement information.  (*Id.* ¶ 6.3).  Members may opt out or object by following the prescribed process.  (*Id.* ¶¶ 11, 12.)

To obtain relief from Defendants, Settlement Class members will be required to submit the claim form on or before a deadline that will be set by mutual agreement of the Parties.  (*Id.* ¶¶ 2.10, 7.1).  The claims will be reviewed and approved by the Settlement Administrator, who will then make a determination of the amount owed each class member using Defendants' electronic records, and then have 180 days after the Final Settlement Date to distribute the monetary relief.[5] (*Id.* ¶¶ 7.3, 7.4.2, 7.4.3, 7.4.4.)  The Settlement Administrator will advise Class Counsel promptly of any claims deemed invalid before those claims are denied so that Class Counsel may follow up with the borrower to cure any deficiency in his or her submission.  (*Id.* ¶ 7.2.) The parties agree to attempt to resolve any disputes related to the denial of class member claims in good faith.

A claims-made process is appropriate here, as SPS and the Assurant Defendants have represented that they cannot, on a system-wide basis and without an individualized review, determine the amounts paid or currently owed by a borrower for LPI.

### E.  *Class Counsel Fees and Expenses and Named Plaintiffs' Case Contribution Award*

The undersigned law firms are proposed to serve as Class Counsel, without objection from the Defendants.  (*Id.* ¶ 2.15.).  Class Counsel's application for fees and expenses for all of the various law firms from across the country that are involved will not exceed $4.15 million.  (*Id.* ¶ 15.1.)  Defendants will also pay the named plaintiffs service awards not to exceed $5,000.00 each.

---

[5] For borrowers who did not pay the amounts charged them for LPI, the Settlement Administrator will have 90 days to provide Defendants with a list of class members who submitted claim forms, which will include the amount to be credited to borrowers who did not pay the amounts charged them for LPI. (Ex. A ¶ 7.4.2.)  Defendants will then have an additional 90 days to credit these borrowers' accounts or cause the Settlement Administrator to issue them checks for the amount due pursuant to the Settlement's terms.  (*Id.* ¶ 7.4.4.)

(*Id.* ¶ 15.4.) The Court will consider these awards separate and apart from the fairness, reasonableness, and adequacy of the settlement. (*Id.* ¶ 15.5.)

### F. *Final Approval and Objections*

Class members may object to the settlement no later than 30 days prior to the Final Approval Hearing, or as the Court may otherwise direct. (*Id.* ¶ 2.34.) The Motion for Attorneys' Fees shall be filed 10 days prior to the deadline for filing objections and the Parties shall respond to any objections within 10 days prior to the Final Approval Hearing.

## **LEGAL ARGUMENT**

### I. THE COURT SHOULD PRELIMINARILY APPROVE THE SETTLEMENT.

Settlement "has special importance in class actions with their notable uncertainty, difficulties of proof, and length. Settlements of complex cases contribute greatly to the efficient use of judicial resources, and achieve the speedy resolution of justice[.]" *Turner v. Gen. Elec. Co.*, No. 2:05-CV-186-FTM-99DNF, 2006 WL 2620275, at *2 (M.D. Fla. Sept. 13, 2006). For these reasons, "[p]ublic policy strongly favors the pretrial settlement of class action lawsuits." *In re U.S. Oil & Gas Litig.*, 967 F.2d 489, 493 (11th Cir.1992). "Approval of a class action settlement is a two-step process." *Fresco v. Auto Data Direct, Inc.*, No. 03-cv-61063, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007). Preliminary approval is the first step, requiring the Court to "make a preliminary determination on the fairness, reasonableness, and adequacy of the settlement terms." *Id.* In the second step, after notice to the class and time and opportunity for absent class members to object or otherwise be heard, the court considers whether to grant final approval. *Smith v. Wm. Wrigley Jr. Co.*, 2010 WL 240119, at *2 (S.D. Fla. June 15, 2010).

The standard for preliminary approval of a class action settlement is not high—a proposed settlement should be preliminarily approved if it falls "within the range of possible approval" or if there is "probable cause" to notify the class of the proposed settlement and "to hold a full-scale

9

hearing on its fairness[.]" *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1384 (D. Md. 1983) (citation omitted). Applying this standard, this Court has granted preliminary approval of eight settlements with similar facts.

### A. The Settlement Is the Product of Good-Faith, Informed, and Arm's-Length Negotiations among Experienced Counsel.

At the preliminary approval stage, district courts consider whether the proposed settlement appears to be "'the result of informed, good-faith, arms'-length negotiation between the parties and their capable and experienced counsel' and not 'the result of collusion[.]'" *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011). The settlement terms in this case are the product of significant give and take by the settling parties, and were negotiated at arm's length. The parties participated in an intensive mediation with Jonathan Marks, a well-respected mediator with significant experience resolving complex suits. Mr. Marks and the parties participated in an in-person session on July 7, 2015, as well as weeks of continuing negotiation by telephone and email. The very fact of Mr. Marks' involvement weighs in favor of preliminary approval. *See, e.g., Lobatz v. U.S. In re Educ. Testing Serv. Praxis Principles of Learning & Teaching, Grades 7-12 Litig.*, 447 F. Supp. 2d 612, 619-20 (E.D. La. 2006) (use of court-appointed special master to oversee mediation evidenced procedural fairness of negotiating process); *In re WorldCom, Inc. ERISA Litig.*, 2004 WL 2338151, at *6 (S.D.N.Y. Oct. 18, 2004) (that "[a] respected and dedicated judicial officer presided over the lengthy discussions from which this settlement emerged" belied any suggestion of collusion).

The parties' extensive negotiations were also informed by considerable discovery. Defendants produced more than ten thousands pages of documents, and both Plaintiffs and Defendants were deposed. This was in addition to millions of pages of documents produced in other LPI litigation involving the Assurant Defendants, Class Counsel, and their co-counsel. *See,*

10

*e.g.,*; *Fladell*, No. 13-cv-60721; *Montoya*, No. 14-cv-20474; *Saccoccio*, No. 13-cv-21107. More than thirty depositions have been taken or used in those cases.

### B. The Settlement Falls Squarely within the Range of Reasonableness.

The Settlement provides considerable monetary and injunctive relief to the Settlement Class, and falls well within the range of possible approval.

#### 1. Monetary Relief

The Settlement Agreement provides significant monetary benefits. Settlement Class members who paid LPI charges will be eligible to receive a check for 12.5%, 6.5%, or 5% of the net premium charged as long as they paid a portion of the premium, and all class members who were charged for LPI but did not pay any premium will receive 12.5%, 6.5%, or 5% of the net premium charged by check or a credit to their account as described above. This percentage will be taken from the entire amount charged, most of which protected SPS' interests in borrowers' properties. (*Id.*) Settlement Class members, that is, will not recover 12.5%, 6.5%, or 5% of their economic damages; they will instead recover a substantial portion of the amounts they were charged in excess of the actual cost of LPI coverage.

Federal courts hold that settlements providing the class with a percentage of the recovery sought in litigation are reasonable in light of the attendant risks of litigation. *See, e.g., Johnson v. Brennan*, No. 10-cv-4712, 2011 WL 4357376 (S.D.N.Y. Sept. 16, 2011) ("[T]here is no reason, at least in theory, why a satisfactory settlement could not amount to a hundredth or even a thousandth part of a single percent of the potential recovery."); *Behrens v. Wometco Enter., Inc.*, 118 F.R.D. 534, 542-43 (S.D. Fla.) (approving recovery of $.20 per share where desired recovery was $3.50 a share because "the fact that a proposed settlement amounts to only a fraction of the possible recovery does not mean the settlement is inadequate or unfair"); *Fisher Bros., Inc. v. Mueller Brass Co.*, 630 F. Supp. 493, 499 (E.D. Pa. 1985) (approving settlement providing recovery of 0.2% of

11

sales). "Moreover, when settlement assures immediate payment of substantial amounts to class members, even if it means sacrificing speculative payment of a hypothetically larger amount years down the road, settlement is reasonable[.]" *Johnson*, 2011 WL 4357376, at *12.

Plaintiffs and the Settlement Class faced significant hurdles in litigating their claims to resolution, including overcoming Defendants' filed-rate doctrine and other defenses. Each class member stands to recover hundreds, if not thousands, of dollars as a result of the settlement. The settlement's monetary recovery falls well within the range of reasonableness.

### 2. Injunctive Relief

Once approved, the settlement will also prohibit SPS and the Assurant Defendants for five years from accepting an illegitimate financial interest in the placement of LPI. (Ex. A ¶¶ 4.2, 4.3). This means that SPS will no longer collect, and the Assurant Defendants will no longer pay, *inter alia*, LPI commissions to SPS-affiliated agents or brokers, or revenue arising from quota-share reinsurance arrangements that do not comply with the risk transfer standards of Accounting Standards Codification 944, or payments for below-cost outsourced services. (*Id.*) The Settlement Agreement effectively prohibits SPS and the Assurant Defendants from continuing to implement the practices complained of. There can be no question that this result is reasonable.

### C. Plaintiffs and the Settlement Class Will Avoid Considerable Litigation Hurdles.

Any evaluation of the settlement benefits must be tempered by the recognition that any compromise involves concessions by the parties. Indeed, "the very essence of a settlement is compromise, 'a yielding of absolutes and an abandoning of highest hopes.'" *Officers for Civil Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 624 (9th Cir. 1982) (citations omitted). Had litigation continued, Plaintiffs and Settlement Class members would have risked not prevailing on any of their claims. In this matter, the Defendants raised numerous defenses to Plaintiffs' claims, including application of the filed-rate doctrine which this Court has recognized as potentially

12

dispositive. *See, e.g., Montoya*, 2014 U.S. Dist. LEXIS 119464 (noting that given recent developments, "Plaintiffs' force-placed insurance claims confront a blustery legal atmosphere"); *see also Fladell*, (May 26, 2013 Hrg. Tr. at 12:23-25, 21:17-21, 92:2-3, 74:4-9, 92:21-23); *Kunzelmann*, 2013 WL 139913 (S.D. Fla. Jan. 10, 2013) (declining to certify nationwide class and noting obstacles posed by filed-rate doctrine, among other things).

### D. Class Counsel Believes the Settlement Is Reasonable.

Significant weight should be attributed to the belief of experienced counsel that the negotiated settlement is in the best interest of the class. *See In re Coordinated Pretrial Proceedings in Antibiotic Antitrust Actions*, 410 F. Supp. 659, 666 (D. Minn. 1974) (recommendation of experienced counsel is entitled to great weight); *DeBoer v. Mellon Mortg. Co.*, 64 F.3d 1171, 1178 (8th Cir. 1995). "The views of the parties to the settlement must … be considered." Counsel here have litigated numerous LPI class actions over the course of over four years, and fully support the settlement. They certified the first LPI class in Florida in *Williams*, No. 11-cv-21233, and then settled that case; litigated the motion for class certification in *Kunzelmann*; briefed and argued five motions to centralize LPI litigation in nationwide MDLs; settled claims against Chase, HSBC, Wells Fargo, Bank of America, SunTrust, Nationstar, Ocwen, PNC, Everbank and their force-placed insurers on behalf of nationwide classes, secured final approval of seven of those settlements, and are awaiting decision on the other two. Based on this experience, and decades more with class action lawsuits, it is Class Counsel's opinion that, given the uncertainty and expense of pursuing these claims through trial, the settlement is fair, reasonable, adequate, and in the best interests of the Settlement Class.

## II. THE COURT SHOULD CERTIFY THE PROPOSED SETTLEMENT CLASS.

"It is well established that a class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *In re*

*Checking Account Overdraft Litig.*, 275 F.R.D. at 659 (brackets in original). "In deciding whether to provisionally certify a settlement class, a court must consider the same factors that it would consider in connection with a proposed litigation class," save manageability, "since the settlement, if approved, would obviate the need for a trial." *Id.*

### A. The Settlement Class Meets the Four Requirements of Rule 23(a).

The policies underlying the class action rule dictate that Rule 23(a) should be liberally construed. *See Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 323 (S.D. Fla. 1996).

#### 1. The Settlement Class Is Sufficiently Numerous.

Rule 23(a)(1) requires Plaintiffs to show that the proposed class is so numerous that joinder of all members would be impracticable. *See* Fed. R. Civ. P. 23(a)(1). "While there is no fixed rule, generally a class size [of] less than twenty-one is inadequate, while a class size of more than forty is adequate." *Williams*, 2012 WL 566067, at *4 (citing *Cheney v. Cyberguard Corp.,* 213 F.R.D. 484, 489-90 (S.D. Fla. 2003)). The parties have valued the monetary relief in settlement in this case as being worth tens of millions of dollars, with SPS having forced tens of thousands of policies during the class period in Florida alone. The proposed class in this case well exceeds the minimum threshold. *See Cox,* 784 F.2d at 1553. The numerosity requirement is satisfied here.

#### 2. Questions of Law and Fact Are Common to All Settlement Class Members.

Rule 23(a)(2) requires class action plaintiffs to identify questions of law or fact common to the proposed class. *See* Fed. R. Civ. P. 23(a)(2). "The threshold for commonality is not high." *Cheney,* 213 F.R.D. at 490. Commonality requires a showing that the class members' claims "depend on a common contention" and that the class members have "suffered the same injury." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011). "[F]or purposes of Rule 23(a)(2), even a single [common] question will do[,]" *id.* at 2556 (brackets in original), and "where a

common scheme of conduct has been alleged, the commonality requirement should be satisfied." *Checking Overdraft,* 2011 WL 3158998, at *4.

Plaintiffs' claims here depend on the common contention that Defendants conceived and implemented a scheme to manipulate and artificially inflate LPI premiums that they would then charge to the borrower. All members of the putative class were injured in the same manner: they were charged LPI premiums that included inflated costs, and have paid or now owe amounts in excess of what their mortgage agreements allowed. *See Williams,* 2012 WL 566067, at *5 (finding commonality where "all members of the propose class were injured in the same manner, namely by being charged inflated premiums for the LPI").

### 3. Plaintiffs' Claims Are Typical of Those of the Settlement Class.

Rule 23(a)(3) requires Plaintiffs to demonstrate that their claims are typical of those held by the proposed class. *See* Fed. R. Civ. P. 23(a)(3). Typicality and commonality are related, with commonality referring to "the group characteristics of the class as a whole" and typicality focusing on the named plaintiff's claims in relation to the class. *Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. at 686 n.23. "Any atypicality or conflict between the named Plaintiff's claims and those of the class must be clear and must be such that the interests of the class are placed in significant jeopardy." *Cheney,* 213 F.R.D. at 491. Plaintiffs' claims in this case arise from the same course of conduct and are based on the same legal theories as those brought on behalf of the proposed class. Plaintiffs and every class member took mortgage loans from SPS or its predecessors that were governed by common and materially uniform agreements.

### 4. Plaintiffs and Their Counsel Are Adequate Representatives.

To satisfy Rule 23(a)(4), the representative parties must "fairly and adequately represent the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied when the class representatives have (1) no interests antagonistic to the rest of the class and (2) counsel who are

"qualified, experienced, and generally able to conduct the proposed litigation." *Cheney*, 213 F.R.D. at 495. "Adequate representation is presumed in the absence of contrary evidence." *Association for Disabled Ams., Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 464 (S.D. Fla. 2002).

### a. Plaintiffs Do Not Have Interests Antagonistic to Settlement Class Members.

Adequacy exists where a class representative shares common interests with the class and seeks the same type of relief for himself and the settlement class members. *See Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997); *Kreuzfeld A.G. v. Carnehammar*, 138 F.R.D. 594, 600 (S.D. Fla. 1991). Here, Plaintiffs have no interest antagonistic to those held by the Settlement Class. The class definition includes only those who were subject to Defendants' LPI scheme. (Ex. A ¶ 2.48). All class members had LPI forced on their homes and were charged inflated amounts for coverage. (*Id.*) Thus, the critical issues in this case—the existence, implementation, and unlawfulness of Defendants' LPI scheme—are common issues. Plaintiffs and absent class members share a common goal: to recover the inflated portion of the amounts charged for LPI. Plaintiffs have satisfied Rule 23(a)(4). *See Williams*, 2012 WL 566067, at *6-7.

### b. Settlement Class Counsel Are Qualified and Experienced.

The attorneys who seek to represent the Settlement Class in this case are highly qualified to serve as class counsel, have been investigating LPI claims for more than four years, and have served as lead and co-lead counsel in some of the largest class actions in the country, as well as insurance-related complex cases. The three law firms that Plaintiffs seek to name as Class Counsel in this action are Kozyak Tropin & Throckmorton, LLP, Podhurst Orseck, P.A., and Harke Clasby & Bushman, LLP. These firms have successfully prosecuted consumer class actions and their law firms are well respected in the communities that they serve.

### B. The Settlement Class Meets the Requirements of Rule 23(b)(3).

In addition to meeting the four requirements of Rule 23(a), a plaintiff seeking class

certification must satisfy one subsection of Rule 23(b). *Cheney*, 213 F.R.D. at 489. Plaintiffs here seek certification under Rule 23(b)(3), under which certification is appropriate if (1) common questions of law or fact predominate over those affecting only individual class members and (2) class treatment is superior to other adjudication methods. *See* Fed. R. Civ. P. 23(b)(3). The latter question implicates manageability concerns, which do not bear on certification of a settlement class. *See Checking Account Overdraft Litig.*, 275 F.R.D. at 659.

Moreover, a comprehensive resolution of the Settlement Class members' claims in this action would be far superior to litigating each of their claims separately. "Since the damage amounts allegedly owed to each individual [borrower] are relatively low—especially as compared to the costs of prosecuting the types of claims in this case involving complex, multi-level business transactions between sophisticated defendants—the economic reality is that many of the class members would never be able to prosecute their claims through individual lawsuits." *Williams*, 280 F.R.D. at 675. Accordingly, the Court should certify the proposed class.

**III.     THE COURT SHOULD APPROVE THE PROPOSED CLASS NOTICE.**

Federal Rule of Civil Procedure 23(e)(1) provides that the "court must direct notice in a reasonable manner to all class members who would be bound by the proposal." Class notice should be "reasonably calculated, under the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950).

The parties' proposed notice plan readily meets this standard. The Settlement Agreement provides that the Settlement Administrator shall distribute class notice by first-class mail in the form attached as Exhibit A to the Settlement Agreement to all identifiable class members no fewer than 90 days before the final approval hearing. (Ex. A ¶ 6.1). The Settlement also provides for internet notice and a toll-free number through which Settlement Class members can acquire

17

information, and allows class members to submit claims online. (*Id.* ¶¶ 6.2, 6.3 & Exs.).

The notice itself also satisfies the requirements of the Federal Rules. It provides, among other things, a clear definition of the Class; a description of the underlying lawsuit and the material terms of the Settlement; instructions as to how Settlement Class members may make a claim and determine whether they are eligible to do so; an explanation of objection and opt-out rights and a date by which Settlement Class members may opt out, and information regarding how to do so; the date on which the Court will hold a Final Approval Hearing; and the internet address and toll-free number from which class members may obtain additional information about the Settlement and its terms. (*Id.* at Ex. A.)

### IV. THE COURT SHOULD APPOINT THE UNDERSIGNED FIRMS AS CLASS COUNSEL.

The parties have defined Class Counsel to include the three undersigned law firms. (Ex. A ¶ 2.15). Plaintiffs and the undersigned now move the Court to appoint these three firms as Settlement Class Counsel, as it has done in numerous other LPI actions. Undersigned counsel have significant experience litigating these cases, having represented plaintiffs in actions against fourteen major mortgage lenders, the Assurant Defendants, and QBE, the other major force-placed insurer that contracts with major lenders to issue force-placed coverage.

### V. THE COURT SHOULD SCHEDULE A FINAL APPROVAL HEARING.

Plaintiffs request that the Court schedule the Final Approval Hearing at its earliest convenience no fewer than 150 days after entry of an order preliminarily approving the Settlement. Should the Court grant this Motion, Plaintiffs will file their final approval motion on a date set by the Court, which shall be no earlier than ninety days after service of class notice, and Class Counsel will file their fee application at least ten days prior to any objection or opt-out deadline.

### CONCLUSION

The Court should enter an order granting preliminary approval of the settlement.

Respectfully submitted this 15th day of September, 2015.

By: /s/ Adam M. Moskowitz

| | |
|---|---|
| Adam M. Moskowitz, Esq.<br>Florida Bar No. 984280<br>amm@kttlaw.com<br>Thomas A. Tucker Ronzetti, Esq.<br>Florida Bar No. 965723<br>tr@kttlaw.com<br>Rachel Sullivan, Esq.<br>Florida Bar No. 815640<br>rs@kttlaw.com<br>Robert J. Neary, Esq.<br>Florida Bar No. 81712<br>rn@kttlaw.com<br>**KOZYAK TROPIN &**<br>**THROCKMORTON LLP**<br>2525 Ponce de Leon Blvd., 9th Floor<br>Coral Gables, FL 33134<br>Telephone:  (305) 372-1800<br>Facsimile:    (305) 372-3508<br>*Counsel for Plaintiff* | Aaron S. Podhurst, Esq.<br>Florida Bar No. 63606<br>apodhurst@podhurst.com<br>Peter Prieto, Esq.<br>Florida Bar No. 501492<br>pprieto@podhurst.com<br>John Gravante, III, Esq.<br>Florida Bar No. 617113<br>jgravante@podhurst.com<br>Matthew Weinshall<br>Florida Bar No. 84783<br>mweinshall@podhurst.com<br>**PODHURST ORSECK, P.A.**<br>City National Bank Building<br>25 West Flagler Street, Suite 800<br>Miami, Florida 33130<br>Telephone: 305-358-2800<br>Facsimile: 305-358-2382<br>*Counsel for Plaintiff* |
| Lance A. Harke, Esq.<br>Florida Bar No. 863599<br>lharke@harkeclasby.com<br>Sarah Engel, Esq.<br>Florida Bar No. 991030<br>sengel@harkeclasby.com<br>Howard M. Bushman, Esq.<br>Florida Bar No. 0364230<br>hbushman@harkeclasby.com<br>**HARKE CLASBY & BUSHMAN LLP**<br>9699 NE Second Avenue<br>Miami Shores, Florida 33138<br>Telephone:    (305) 536-8220<br>Facsimile:     (305) 536-8229<br>*Counsel for Plaintiff* | |

## **CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing was filed electronically via CM/ECF on the 15th day of September, 2015 and served by the same means on all counsel of record.

By:  /s/ Adam M. Moskowitz